Attachment C

(See continued pages)

AO 106 (Rev. 1/89) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

949 Connecticut Street, San Francisco, California, More Particularly Described in Attachment A

SEALED BY COURT ORDER

APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

Case Number:

3 08 70477 MEJ

I, Jason Rao being duly sworn depose and say:

I am a(n) Special Agent, Immigration and Customs Enforcement and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the Northern District of California

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence, contraband, fruits and instrumentalities of the commission of a criminal offense

concerning a violation of Title 8/18 United States code, Section(s) 1324/1001, 1546

The facts to support a finding of probable cause are as follows:

See Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

Approved As To Form: AUSA W.S. Wilson Leung

Signature of Affiant

Sworn to before me and subscribed in my presence,

July 25, 2008 at San Francisco CA
Date City State

Hon. Maria-Elena James U.S.M.J.
Name of Judge Title of Judge

Signature of Judge

SW0056

**AFFIDAVIT OF JASON RED**

I, JASON RED, Special Agent with Immigration and Customs Enforcement, being duly sworn, do declare and state:

1. I am a Special Agent with Immigration and Customs Enforcement ("ICE") and have been so employed since 2008. I am presently assigned to ICE's San Francisco office, where I investigate violations of federal law, with a focus on violent crimes and crimes committed by street gangs, as well as violations of immigration law. During my career with ICE, I have received training on a variety of law enforcement subjects, including immigration enforcement, violent crimes, narcotics trafficking, criminal procedure, search warrants, and gangs. I have also conducted and participated in numerous investigations of street crimes and immigration offenses, and have participated in the execution of numerous search warrants. The information set forth below is based on my own investigation or on conversations I have had with other law enforcement officers and from reviewing law enforcement documents.

2. This Affidavit is made in support of a Criminal Complaint charging **JONATHAN CRUZ-RAMIREZ** with illegal re-entry into the United States, in violation of Title 8, United States Code, Section 1326. This Affidavit is further made, pursuant to Federal Rule of Criminal Procedure 41, in support of a warrant to search the premises known and described as 949 Connecticut Street, San Francisco, California (the "**PREMISES**"), in the Northern District of California, which is the home of **CRUZ-RAMIREZ**.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause for an arrest warrant and a search warrant, I have not included each and every fact known to me that supports probable cause for arrest or probable cause for search. Rather, I have set forth only the facts that I believe are necessary to support the lawful arrest of **CRUZ-RAMIREZ** and the search of the **PREMISES**.

4. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

**PROBABLE CAUSE FOR THE ARREST OF JONATHAN CRUZ-RAMIREZ**

5. I learned the following from reviewing the immigration records of **JONATHAN CRUZ-RAMIREZ**.

a. On or about December 31, 2007, the Border Patrol CRUZ RAMIREZ near Nogales, Arizona, near the United States-Mexico border, without any immigration documents authorizing his presence in the United States. Following his detention, **CRUZ-RAMIREZ** appeared before a Border Patrol Agent for an expedited removal proceeding pursuant to 8 C.F.R. Section 235(b)(1). Following this proceeding, the Border Patrol Agent determined that **CRUZ-RAMIREZ** was excludable and ordered him removed.

b. A Notice to Alien Ordered Removed/Departure Verification was issued to **CRUZ-RAMIREZ**, which advised him that he was barred from the United States for a period of five years and warned him that illegally re-entering the United States was a criminal violation of Title 8, United States Code, Section 1326. **CRUZ-RAMIREZ** signed this Notice on or about January 2, 2008, affixed one of his fingerprints on it, and was allowed to walk back to Mexico. This Notice also contained a photograph of **CRUZ-RAMIREZ**.

6. I am familiar with the photograph affixed on the Notice to Alien Ordered Removed/Departure Verification for **JONATHAN CRUZ-RAMIREZ** and have seen an individual in San Francisco who appears to be **JONATHAN CRUZ-RAMIREZ**. Indeed, approximately three weeks ago, I spoke with this individual, and he identified himself to me as "Jonathan Cruz." Moreover, I have reviewed criminal records for an individual named "Jonathan Cruz" who has the same date of birth as **JONATHAN CRUZ-RAMIREZ**. Moreover, I learned from a police officer with the SFPD's Gang Task Force that the individual who identified himself to me as "Jonathan Cruz" three weeks ago was detained briefly by the police but not charged with any crime. "Jonathan Cruz" identified himself again as "Jonathan Cruz" and stated that he lived at the **PREMISES**.[1]

**PROBABLE CAUSE TO SEARCH THE PREMISES**

7. I learned from reviewing criminal records for **JONATHAN CRUZ-RAMIREZ** that he is presently on probation for receiving stolen property in or about November 28, 2007. According to his probation records, he resides at the **PREMISES**.

8. I learned from members of the SFPD who have seen the **PREMISES** that it is a unit in a multi unit dwelling located on Connecticut Street. The **PREMISES** is clearly marked with

---

[1] The SFPD did not immediately report the detention of "Jonathan Cruz" to ICE because there was concern that doing so would violate San Francisco's "sanctuary city" policy.

the number "949" affixed above the blue, and the PREMISES itself is painted orange and tan, as described in Attachment A hereto, which is incorporated fully by reference herein.

9. Based on my experience and training, I know that illegal aliens often possess and use fraudulent and counterfeit documents in order to come into the United States illegally and live in the United States. This is particularly true for illegal aliens who have criminal convictions, such as **JONATHAN CRUZ-RAMIREZ**, who, because of their criminal records, would attract attention at border crossings and other official check points, as well as at any occasion when they have to interact with law enforcement or government personnel. Based on my experience and training, I know that such fraudulent and counterfeit documents include, by way of example, false driver's licenses, Green Cards, passports, and birth certificates. Indeed, based on my experience and training, I know that there are loosely affiliated individuals who refer to themselves as *micas* who sell high-quality counterfeit identification documents in San Francisco, often to illegal aliens with criminal history. Moreover, based on my experience and training, I know that illegal aliens in possession of fraudulent and counterfeit documents, when not carrying such contraband items, generally keep these items in their residences, usually hidden until they are needed because of these documents' importance to allowing them to function in the United States. Furthermore, based on my experience and training, I know that illegal aliens generally keep their real identifications and immigration and birth records in their homes instead of on their persons in order to keep these documents secure while ensuring that these documents do not incriminate them.

10. Accordingly, based on the foregoing, I respectfully submit that there is probable cause to believe that the **PREMISES** of **JONATHAN CRUZ-RAMIREZ** presently contains fraudulent and counterfeit documents such as false identifications, immigration documents, passports, and birth certificates, and other items set forth in Attachment B (incorporated in full by reference herein), all of which constitute evidence, instrumentalities, and fruits of **CRUZ-RAMIREZ**'s violation of Title 8, United States Code, Section 1326, as well as a possible of other statutes, including Title 18, United States Code, Sections 1028 (fraudulent identification documents) and 1546 (fraudulent immigration documents). Based on my experience and training, I know that such items are often contained in closed and/or locked containers, and respectfully request permission to open and search such containers during execution of the search warrant.

## REQUEST TO SEAL THIS APPLICATION

11. Based on my experience and training, I believe that if the contents of this Affidavit be made public, the contents would jeopardize this investigation by prompting the target of this investigation to destroy evidence, notify accomplices, or flee from prosecution. For

the foregoing reasons, and because this is an ongoing investigation, I request that this Application be sealed in its entirety until further order of the court.

## CONCLUSION

12. For the foregoing reasons, I respectfully submit that there is probable cause to believe that **JONATHAN CRUZ-RAMIREZ** is in violation of Title 8, United States Code, Section 1326, and that the **PREMISES** presently contains evidence, instrumentalities, and fruits of that violation, as well as violations of other federal law. I respectfully request that an arrest warrant be issued for **CRUZ-RAMIREZ** and that a search warrant be issued for the **PREMISES**.

JASON REID
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me
this 23rd day of July, 2008

HONORABLE MARIA-ELENA JAMES
UNITED STATES MAGISTRATE JUDGE

SW0089

Attachment A

Description of the **PREMISES** to be Searched

The **PREMISES** to be search is a unit in a multi-unit dwelling located on Connecticut Street near Wisconsin Street in San Francisco. The **PREMISES** itself is clearly marked with the number "949" affixed above the door. The door itself is blue, and the building is painted orange and tan.

Attachment B

Items to be Seized

1. Any and all documents relating to identity, including such documents as driver's licenses, identification cards, passports, credit cards and bank cards, and birth certificates.

2. Any and all documents relating to immigration and naturalization, including such documents as green cards (i.e., permanent alien resident cards), Social Security cards, passports, and naturalization applications/certificates.

3. Any and all documents constituting indicia of habitation, ownership, and/or control of the PREMISES, including bills, correspondence, leases, and rental agreements.

AO 106 (Rev. 1/87) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

949 Connecticut Street, San Francisco, California, More Particularly Described in Attachment A

APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

3 08 70478

Case Number:

MEJ

SEALED BY COURT ORDER

I, Jason Ries being duly sworn depose and say:

I am a(n) Special Agent, Immigration and Customs Enforcement and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the Northern District of California

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

evidence, contraband, fruits and instrumentalities of the commission of a criminal offense

concerning a violation of Title 18 United States code, Section(s) 1962(d) and 1959

The facts to support a finding of probable cause are as follows:

See Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

Approved As to Form: W.S. Wilson Leung AUSA

Signature of Affiant

Sworn to before me and subscribed in my presence,

July 23, 2008 at San Francisco CA
Date City State

Hon. Maria-Elena James U.S.M.J.
Name of Judge Title of Judge

Signature of Judge

SW0083

**AFFIDAVIT OF JASON RED**

I, JASON RED, Special Agent with Immigration and Customs Enforcement, being duly sworn, do declare and state:

1. I am a Special Agent with Immigration and Customs Enforcement ("ICE") and have been so employed since 2004. I am presently assigned to ICE's San Francisco office, where I investigate violations of federal law, with a focus on violent crimes and crimes committed by street gangs, as well as violations of immigration law. During my career with ICE, I have received training on a variety of law enforcement subjects, including immigration enforcement, violent crimes, narcotics trafficking, criminal procedure, search warrants, and gangs. I have also conducted and participated in numerous investigations of street crimes and immigration offenses, and have participated in the execution of numerous search warrants. The information set forth below is based on my own investigation or on conversations I have had with other law enforcement officers and from reviewing law enforcement documents.

2. This Affidavit is made, pursuant to Federal Rule of Criminal Procedure 41, in support of a warrant to search the premises known and described as 949 Connecticut Street, San Francisco, California (the "**PREMISES**"), in the Northern District of California, which is the home of Jonathan Cruz-Ramirez. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only the facts that I believe are necessary to support a search of the **PREMISES**.

3. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

**Background: The Prior Search Warrant Issued On July 25, 2008**

4. Earlier today, July 25, 2008, the Honorable Maria-Elena James granted a warrant to search the **PREMISES** for evidence, instrumentalities, and fruits of violations of Title 8, United States Code, Section 1326 (illegal re-entry), and Title 18, United States Code, Sections 1028 (fraudulent identifications) and 1546 (fraudulent immigration documents). A copy of that earlier search warrant application for the **PREMISES** is attached hereto as Attachment C and is incorporated fully by reference herein.

5. Following the issuance of this earlier search warrant for the **PREMISES**, other agents I went to the **PREMISES** to execute the warrant. No one was in the **PREMISES**, so we let ourselves in and conducted a protective sweep. During this sweep, another agent and I opened a closet door and saw, in plain sight, a firearm. Accordingly, this application now seeks to expand the scope of the original search warrant to authorize the search and seizure of other items, including guns, ammunition, other weapons, indicia of gun ownership, as well as indicia of gang membership.

**Probable Cause To Expand The Prior Search Warrant**

6. Based on my experience, training, and investigation of this matter, including my conversations with a San Francisco Police Department ("SFPD") Inspector (the "Inspector") who has been investigating criminal street gangs for approximately a decade, I know that La Mara Salvatrucha, also known as "MS-13," is an international street gang that has a chapter (or a "clique") in San Francisco. Members of MS-13 in San Francisco wear blue as their gang color. According to this Inspector, Jonathan Cruz-Ramirez, whom the Inspector has known for several years, is a member of the San Francisco clique of MS-13. Based on my investigation of this matter and on my conversations with the Inspector as well as other members of the SFPD, I know that several recent murders in San Francisco have been suspected of having been committed by members of MS-13 resulting from disputes between MS-13 and members (or perceived members) of rival gangs.

7. Accordingly, in light of the discovery of the gun in the **PREMISES**, and the affiliation of Jonathan Cruz-Ramirez -- who occupies the **PREMISES** -- with MS-13, I respectfully submit that there is probable cause to believe that the **PREMISES** contains evidence, instrumentalities, and fruits of criminal violations not originally set forth in the earlier search warrant granted for the **PREMISES**, notably violations of Title 18, United States Code, Sections 1962(d) (racketeering conspiracy), and 1959 (violent crime in aid of racketeering). Such additional evidence, instrumentalities, and fruits of additional crimes include guns, ammunition, other weapons, indicia of gun ownership, as well as indicia of gang membership, such as photographs of gang members, correspondence with gang members, gang rosters, correspondence, diaries, address books, and cellular telephones, computers, and personal data assistants containing the names and contact information of gang members, as set forth in Attachment B hereto, which is fully incorporated by reference herein. Any search of any computers found will be conducted pursuant to the parameters set forth in Attachment B. Moreover, based on my experience and training, I know that such items are often contained in closed and/or locked containers, and respectfully request permission to open and search such containers during execution of the search warrant.

## REQUEST TO SEAL THIS APPLICATION

8. Based on my experience and training, I believe that if the contents of this Affidavit and the underlying application (which is presently under seal) be made public, the contents would jeopardize this investigation by prompting the target of this investigation to destroy evidence, notify accomplices, or flee from prosecution. For the foregoing reasons, and because this is an ongoing investigation, I request that this Application be sealed in its entirety until further order of the court.

## CONCLUSION

9. For the foregoing reasons, I respectfully submit that there is probable cause to believe that the **PREMISES** presently contains evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Section 1962(d) and 1959. I respectfully request that an expanded search warrant be issued for the **PREMISES**.

JASON RED
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me
this 25th day of July, 2008

HONORABLE MARIA-ELENA JAMES
UNITED STATES MAGISTRATE JUDGE

SA/00066

Attachment A

Description of the **PREMISES** to be Searched

The **PREMISES** to be search is a unit in a multi-unit dwelling located on Connecticut Street near Wisconsin Street in San Francisco. The **PREMISES** itself is clearly marked with the number "949" affixed above the door. The door itself is blue, and the building is painted orange and tan.

Attachment B

Items to be Seized

1. Any and all firearms, ammunition, and indicia of firearm ownership and/or possession.

2. Any and all weapons, such as knives, clubs, bladed instruments, and stun guns, as well as defensive armaments, such as bulletproof vests.

3. Any and all items constituting evidence of acts of violence, including any clothing or other items with blood stains.

3. Any and all indicia of gang membership, including, clothing consistent with affiliation or membership in MS-13, correspondence, rosters, diaries, address books, cellular telephones, personal computers, and personal data accessories, and indicia of possession, use, and/or control of such devices, including telephone bills. Search of any computers and similar electronic devices will be conducted pursuant to the procedures set forth in the next pages.

4. The items listed on this Attachment are not exclusive and do not restrict the scope of the search warrant issued for the **PREMISES** earlier today.

Attachment B (cont'd)

January 17, 2000 Revision

United States District Court for the Northern District of California

***PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY***

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment, in the Affidavit Supporting the Warrant

1. In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2. If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3. The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for off site examination - unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime, or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site

search of a device in which data is stored electronically.

4. If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5. The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar days after the initial execution of the warrant. Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime. Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime.

The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6. In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

AO 93 (Rev. 5/85) Search Warrant

# United States District Court

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

[illegible] Street, San Francisco, California More Particularly Described in Attachment A and Closed Items and Containers Contained Therein

**SEARCH WARRANT**

CASE NUMBER: 3 08 70491 MEJ

TO: Special Agent Christopher J. Merendino and any Authorized Officer of the United States

Affidavit(s) having been made before me by Christopher J. Merendino who has reason to believe that [ ] on the person of or [✓] on the premises known as (name, description and/or location)

See Attachment A

in the Northern District of California there is now concealed a certain person or property, namely (describe the person or property)

See Attachment B

which constitutes evidence and instrumentalities of a criminal offense
[illegible]

of a criminal violation(s) of Title 8/18, United States Code, Section(s) 1962(d) and 1959

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before August [illegible]
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime - 6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to Duty U.S. Magistrate Judge as required by law.
U.S. Judge or Magistrate Judge

July 29, 2008, at 4:00 pm at San Francisco, California
Date and Time Issued — City and State

HON. MARIA-ELENA JAMES, U.S.M.J.
Name and Title of Judicial Officer

Signature of Judicial Officer

SW0072

AO 93 (Rev. [illegible]) Search Warrant

## RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
| --- | --- | --- |
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

## CERTIFICATION

I swear that this inventory is true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

U.S. Judge or Magistrate | Date

BW0073

Attachment A

Description of **PREMISES** to be Searched

The **PREMISES** to be searched is a house located on the west side of Hampshire Street between 21st Street and 22nd Street in the Mission District of San Francisco, CA. The **PREMISES** is painted a dull green with white trim with a Spanish tile roof. The **PREMISES** has stairs leading up to the front door, one level above the street, which is clearly marked "944" in white block lettering with a black background to the left of the door. The door itself is a white door with a black metal screen security gate. There are windows with white trim to the left and right of the front door. The **PREMISES** has a secondary entrance on the left side of the stairs that is a white door with a black metal screen security gate. There is a gray metal gate approximately two and a half feet enclosing a patio on the left side of the stairs. The **PREMISES** has a plywood garage door on the right side of the stairs.

Attachment B

Items to be Seized

1. Any and all documents relating to identity, including such documents as driver's licenses, identification cards, passports, credit cards and bank cards, and birth certificates.

2. Any and all documents relating to immigration and naturalization, including such documents as green cards (i.e., permanent alien resident cards), Social Security cards, passports, and naturalization applications/certificates.

3. Any and all firearms, ammunition, and indicia of firearm ownership and/or possession.

4. Any and all weapons, such as knives, clubs, bladed instruments, and stun guns, as well as defensive armaments, such as bulletproof vests.

5. Any and all items constituting evidence of acts of violence, including any clothing or other items with blood stains.

6. Any and all indicia of gang membership, including, clothing consistent with affiliation of membership in MS-13, correspondence, rosters, diaries, address books, cellular telephones, personal computers, and personal data accessories, and indicia of possession, use, and/or control of such devices, including telephone bills. Search of any computers and similar electronic devices will be conducted pursuant to the procedures set forth in the next pages

7. Any and all documents constituting indicia of habitation, ownership, and/or control of the **PREMISES**, including bills, correspondence, leases, and rental agreements.

Attachment D (continued)

*[illegible]*

United States District Court for the Northern District of California

## *PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY*

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment, in the Affidavit Supporting the Warrant

1. In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2. If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3. The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for off site examination — unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime,

SW0078

or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device in which data is stored electronically.

4. If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5. The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar days after the initial execution of the warrant. Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime. Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime.

The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6. In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and

procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
|---|---|---|
| July 29, 2008 | July 30, 2008 / 0600 Hrs | HERRERA, Narciso |

INVENTORY MADE IN THE PRESENCE OF

Special Agent John Moore

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

INVENTORY OF PROPERTY TAKEN AT 944 HAMPSHIRE STREET, SAN FRANCISCO, CA 94110 IS AS FOLLOWS:

1. Identification Cards / Social Security and I-551
2. AT&T phone Invoices
3. PG&E Invoices and Receipts
4. Two (2) Cell Phones
5. Miscellaneous Foreign Documents
6. Money Transfer Cards and Receipts

CERTIFICATION

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

Maria Elena-James
U.S. Judge or Magistrate

8-12-08
Date

SEALED
BY COURT ORDER
ORIGINAL
FILED
AUG 5 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

1247 Palou Avenue, San Francisco, California, More Particularly Described in Attachment A, and Closed Containers and Items Contained Therein

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number:
3 08 70508 BZ

I, Christopher J. Merendino being duly sworn depose and say:

I am a(n) Special Agent, Immigration and Customs Enforcement and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the Northern District of California

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

evidence, contraband, fruits and instrumentalities of the commission of a criminal offense

concerning a violation of Title 18 United States code, Section(s) 1959(a) and 2(a)(5)(9)(139)

The facts to support a finding of probable cause are as follows:

See Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

Approved
As To
Form: W.S. Wilson Leung
AUSA

Signature of Affiant

Sworn to before me and subscribed in my presence,

August 6, 2008 at San Francisco CA
Date City State

SW0080

**AFFIDAVIT OF CHRISTOPHER J. MERENDINO**

I, CHRISTOPHER J. MERENDINO, Special Agent with Immigration and Customs Enforcement, being duly sworn, do declare and state:

1. I am a Special Agent with Immigration and Customs Enforcement ("ICE") and have been so employed for approximately six years. I am presently assigned to ICE's San Francisco office, where I investigate violations of federal law, with a focus on violent crimes and crimes committed by street gangs, as well as violations of immigration law. During my career with ICE, I have received training on a variety of law enforcement subjects, including immigration enforcement, violent crimes, narcotics trafficking, criminal procedure, search warrants, and gangs. I have also conducted and participated in numerous investigations of street crimes and immigration offenses, and have participated in the execution of numerous search warrants. The information set forth below is based on my own investigation and/or on conversations I have had with other law enforcement officers and from reviewing law enforcement documents.

2. This Affidavit is made, pursuant to Federal Rule of Criminal Procedure 41, in support of a warrant to search the premises known and described as 1214 Palou Avenue, San Francisco, California, in the Northern District of California (the "**PREMISES**"). As described in greater detail in Attachment A, which is fully incorporated by reference herein, the **PREMISES** is located on Palou Avenue between Jennings and Ingalls Streets in the Bay View District of San Francisco. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not included each and every fact known to me regarding this investigation. Rather, I have set forth only the facts that I believe are necessary to support a search of the **PREMISES**.

3. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

**Background: Prior Searches Of Two Other Locations**

4. On July 25, 2008, the Honorable Maria-Elena James granted a warrant for the arrest of Jonathan Cruz-Ramirez for violating Title 8, United States Code, Section 1326 (illegal re-entry into the United States). Other agents of ICE conducting surveillance on Cruz-Ramirez observed him in another location -- 944 Hampshire Street in San Francisco -- and arrested him on the street after he left 944 Hampshire Street.

5. In addition to granting an arrest warrant for Cruz-Ramirez, Magistrate Judge James also granted a warrant to search the premises known and described as 949 Connecticut Street in San Francisco -- which, according to probation and law enforcement records, was the residence of Cruz-Ramirez — for evidence, instrumentalities, and fruits of violations of Title 8, United States Code, Section 1326, such as fraudulent identifications and immigration documents. During the early evening of July 25, 2008, following the arrest of Cruz-Ramirez, a team conducting the search of 949 Connecticut Street found a firearm in a bedroom closet in that location. The discovery of the firearm — combined with information provided by a San Francisco Police Inspector (the "Inspector") who has known Cruz-Ramirez for several years that Cruz-Ramirez is a member of the Mara Salvatrucha gang ("MS-13") known to carry firearms — prompted the Government to seek another search warrant for 949 Connecticut Street, this time authorizing the seizure of evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1962(d) (racketeering conspiracy) and 1959 (violent crime in aid of racketeering), such as guns, indicia of gun ownership, and indicia of membership in MS-13. This request for a second search warrant for 949 Connecticut Street was granted, and agents searching this location found, in addition to the firearm, a Legal Permanent Resident Card with Cruz-Ramirez's photograph but with the name "Jose Lopez," as well as a Social Security Card with the name "Jose Lopez."

6. While agents were searching 949 Connecticut Street, a woman who identified herself as Cruz-Ramirez's mother arrived at the location. Among other things, she told agents that she lived in 949 Connecticut Street and that the room in which the firearm was found was her son's room. She stated that she assumed the firearm that was found in that room belonged to her son. She further stated that her son did not have much of his personal property at 949 Connecticut, but rather, kept his property at the home of his girlfriend (the "Girlfriend") on Hampshire Street. Based on this information, as well as on agents' surveillance from July 25, 2008 indicating that Cruz-Ramirez repeatedly entering and leaving 944 Hampshire Street, other agents and I concluded that 944 Hampshire Street was Cruz-Ramirez's girlfriend's house and where Cruz-Ramirez kept most of his property. Therefore, on July 29, 2008, I sought and received a search warrant for 944 Hampshire Street, which was executed during the early morning of July 30, 2008. Other agents and I executing the search, however, found nothing obviously relevant to our investigation except for a cellular telephone which contained in its memory the names of known MS-13 members.

**Probable Cause To Search The PREMISES**

7. On July 28, 2008, Cruz-Ramirez made his initial appearance in court and was remanded to the custody of the United States Marshals Service. Other agents and I requested a copy of

his prison calls, which we received on or about July 31, 2008. Based on our review of these calls (interpreted from Spanish), following his court appearance on July 28, 2008, Cruz-Ramirez called his Girlfriend and, in an urgent tone, stated, in sum and substance, that: (a) he needed her to get rid the "thing" that he left in her house; (b) he needed her to get rid of the "thing" immediately; (c) she should give the "thing" to his friend "Kapone," whom I know, based on my investigation of this matter and on my conversations with the Inspector, to be Walter Palma; and (d) she should ask Palma for $200 for the "thing."

8. Significantly, the Inspector referenced above has known Walter Palma for several years, and Palma has admitted to the Inspector that he -- like Cruz-Ramirez -- is a member of MS-13. In addition, the search warrant that was executed on July 30, 2008 at the Girlfriend's house (944 Hampshire Street) authorized the search of, among other things, cellular telephones. Other agents examined a cellular telephone in the Girlfriend's house and noted that, according to the telephone's call history, on or about July 28, 2008 — following the prison call in which Cruz-Ramirez told his Girlfriend to have Palma safeguard the "thing" — the telephone was used to call another number that my investigation has revealed is used by Walter Palma.

9. Based on my experience, training, and investigation of this matter, I believe that the "thing" that Cruz-Ramirez referred to in his conversation with his Girlfriend was an additional firearm or some other form of contraband, such as additional false identifications. As set forth above, the Inspector has advised me that, over the years, he has known Cruz-Ramirez to possess firearms, and one firearm was in fact found in Cruz-Ramirez's home of record. Similarly, an apparently fraudulent Legal Permanent Resident Card as well as an apparently fraudulent Social Security Card were found in Cruz-Ramirez's home of record (949 Connecticut Street), and I believe that he likely had other such documents in his Girlfriend's home (944 Hampshire Street). I therefore believe that Cruz-Ramirez's Girlfriend, at Cruz-Ramirez's direction, took either a firearm, fraudulent documents, or some other inculpatory item that Cruz-Ramirez left in her home and delivered it for them to Walter Palma to safeguard.

10. Accordingly, I believe that there is probable cause to believe that the PREMISES presently contains inculpatory items that Cruz-Ramirez is trying to hide. According to Department of Motor Vehicle records, the **PREMISES** is Walter Palma's home. In addition, another agent who had Palma's photograph conducted surveillance on the **PREMISES** and reported that he observed Palma entering the **PREMISES** on or about Saturday, August 2, 2008. Therefore, in light of Cruz-Ramirez's specific direction to his Girlfriend to get rid of his "thing" by having Palma safeguard it, I believe that the **PREMISES** presently contains evidence, fruits, and instrumentalities of Cruz-Ramirez's crimes, including violations of Title 8, United States Code, Section 1326 (illegal re-entry),

and Title 18, United States Code, Sections 1962(d) (racketeering conspiracy) and 922(g)(5) (illegal alien in possession of firearm), such as such fraudulent and counterfeit identification documents, as well as firearms, ammunition, other weapons, indicia of gun ownership, and indicia of gang membership, such as photographs of gang members, correspondence with gang members, gang rosters, correspondence, diaries, address books, and cellular telephones, computers, and personal data accessories containing the names and contact information for gang members, as set forth in Attachment B hereto, which is fully incorporated by reference herein. Any search of any computers found will be conducted pursuant to the parameters set forth in Attachment B. Moreover, based on my experience and training, I know that such items are often contained in closed and or locked containers, and respectfully request permission to open and search such containers during execution of the search warrant. I also believe that because Cruz-Ramirez specifically asked his Girlfriend to have Palma keep the "thing," as opposed to simply having his Girlfriend discard the "thing," the "thing" remains in Palma's possession in the **PREMISES**.

**CONCLUSION**

11. For the foregoing reasons, I respectfully submit that there is probable cause to believe that the **PREMISES** presently contains evidence, instrumentalities, and fruits of violations of Title 8, United States Code, Section 1326, and Title 18, United States Code, Sections 1962(d) and 922(g)(5). I therefore respectfully request that a search warrant be issued for the **PREMISES**.

CHRISTOPHER J. MERENDINO
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me
this 5th day of August, 2008

HONORABLE BERNARD ZIMMERMAN
UNITED STATES MAGISTRATE JUDGE

**Attachment A**

Description of the **PREMISES** to be Searched

The **PREMISES** to be searched is a three-level house located on the south side of Palou Avenue between Jennings Street and Ingalls Street in the Bay View District of San Francisco, California. The **PREMISES** is painted tan with blue trim with a triangle shape roof. The entrance of the **PREMISES** is a blue door with white trim located on the east side of the street level, which is clearly marked "1247" in golden block lettering above the door. There are windows with blue trim on both east and west side of the second level. There is a single window on the center of the attic level. The **PREMISES** has a blue garage door with white trim on the center of the street level.

**Attachment B**

Items to be Seized

1. Any and all documents relating to identity, including such documents as driver's licenses, identification cards, passports, credit cards and bank cards, and birth certificates.

2. Any and all documents relating to immigration and naturalization, including such documents as green cards (i.e., permanent alien resident cards), Social Security cards, passports, and naturalization applications/certificates.

3. Any and all firearms, ammunition, and indicia of firearm ownership and/or possession.

4. Any and all weapons, such as knives, clubs, bladed instruments, and stun guns, as well as defensive armaments, such as bulletproof vests.

5. Any and all items constituting evidence of acts of violence, including any clothing or other items with blood stains.

6. Any and all indicia of gang membership, including clothing consistent with affiliation of membership in MS-13, correspondence, rosters, diaries, address books, cellular telephones, personal computers, and personal data accessories, and indicia of possession, use, and/or control of such devices, including telephone bills. Search of any computers and similar electronic devices will be conducted pursuant to the procedures set forth in the following pages.

7. Any and all documents constituting indicia of habitation, ownership, and/or control of the **PREMISES**, including bills, correspondence, leases, and rental agreements.

Attachment B (continued)

United States District Court for the Northern District of California

***PROTOCOL FOR SEARCHING DEVICES OR MEDIA***

***THAT STORE DATA ELECTRONICALLY***

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment to the Affidavit Supporting the Warrant.

1. In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2. If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3. The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging or otherwise duplicating its contents for offsite examination – unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime, or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device on which data is stored electronically.

4. If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5. The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar

days after the initial execution of the warrant. Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime. Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime.

The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6. In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

AO 93 (Rev. 5/85) Search Warrant

SEALED
[illegible] ORDER

# United States District Court

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
(Name, address or brief description of the person or property to be searched)

[illegible] Palou Avenue, San Francisco, California, More Particularly Described in Attachment A, and Closed Containers and Items Contained Therein

**SEARCH WARRANT**

CASE NUMBER:

3 08 70508 BZ

TO: Special Agent Christopher J. Marendino and any Authorized Officer of the United States

Affidavit(s) having been made before me by Christopher J. Marendino who has reason to believe that ☐ on the person of or ☑ on the premises known as (name, description and/or location)

Affiant

See Attachment A

in the Northern District of California there is now concealed a certain person or property, namely (describe the person or property)

See Attachment B

which constitutes evidence, contraband, fruits and instrumentalities of a criminal offense
(state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

of a criminal violation(s) of Title 18 United States Code, Section(s) 1962(d), 922(g)(5), 1326
I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

YOU ARE HEREBY COMMANDED to search on or before August 11, 2008
Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search (in the daytime—6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to Duty U.S. Magistrate Judge as required by law.
U.S. Judge or Magistrate Judge

August 5, 2008, at 7:35 pm at San Francisco, California
Date and Time Issued City and State

HON. BERNARD ZIMMERMAN, U.S.M.J. [signature]
Name and Title of Judicial Officer Signature of Judicial Officer

SW0069

AO 93 (Rev. 5/85) Search Warrant

RETURN

| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |
| --- | --- | --- |
| | | |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

CERTIFICATION

I swear that this inventory is true and detailed account of the person or property taken by me on the warrant.

Subscribed, sworn to, and returned before me this date.

U.S. Judge or Magistrate

Date

SW0090

**Attachment A**

Description of the **PREMISES** to be Searched

The **PREMISES** to be searched is a three-level house located on the south side of Palou Avenue between Jennings Street and Ingalls Street in the Bay View District of San Francisco, California. The **PREMISES** is painted tan with blue trim with a triangle shape roof. The entrance of the **PREMISES** is a blue door with white trim located on the east side of the street level, which is clearly marked "1247" in golden block lettering above the door. There are windows with blue trim on both east and west side of the second level. There is a single window on the center of the attic level. The **PREMISES** has a blue garage door with white trim on the center of the street level.

**Attachment B**

Items to be Seized

1. Any and all documents relating to identity, including such documents as driver's licenses, identification cards, passports, credit cards and bank cards, and birth certificates.

2. Any and all documents relating to immigration and naturalization, including such documents as green cards (i.e., permanent alien resident cards), Social Security cards, passports, and naturalization applications/certificates.

3. Any and all firearms, ammunition, and indicia of firearm ownership and/or possession.

4. Any and all weapons such as knives, clubs, bladed instruments, and stun guns, as well as defensive armaments, such as bulletproof vests.

5. Any and all items constituting evidence of acts of violence, including any clothing or other items with blood stains.

6. Any and all indicia of gang membership, including, clothing consistent with affiliation or membership in MS-13, correspondence, rosters, diaries, address books, cellular telephones, personal computers, and personal data accessories, and indicia of possession, use, and/or control of such devices, including telephone bills. Search of any computers and similar electronic devices will be conducted pursuant to the procedures set forth in the following pages.

7. Any and all documents constituting indicia of habitation, ownership, and/or control of the ***PREMISES***, including bills, correspondence, leases, and rental agreements.

Attachment B (continued)

United States District Court for the Northern District of California

***PROTOCOL FOR SEARCHING DEVICES OR MEDIA***

***THAT STORE DATA ELECTRONICALLY***

THIS PROTOCOL WILL BE ATTACHED TO EACH SEARCH WARRANT THAT AUTHORIZES A SEARCH OF ANY DEVICE OR MEDIA THAT STORES DATA ELECTRONICALLY

It Also Will Be Incorporated, At Least As An Attachment, in the Affidavit Supporting the Warrant.

1. In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if authorized by law because removal is (1) necessary to preserve evidence, or (2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of crime.

2. If the government determines that a reasonable search as authorized in this warrant cannot be completed at the site within a reasonable period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then completing the search of the mirror image off site (e.g., at a computer crime laboratory).

3. The government may remove from the search location a device only if the device cannot be searched reasonably on site, or by mirror-imaging, or otherwise duplicating its contents for offsite examination – unless authorized by law to remove the device because (1) removing the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable instrumentality of the crime, or fruit of crime. The government also may remove from the site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or software manuals) that reasonably appear to be necessary to conduct an off-site search of a device in which data is stored electronically.

4. If the government removes a device or related equipment or documents from the place they were found in order to complete the search off-site, within ten calendar days of the removal the government must file a return with a magistrate judge that identifies with particularity the removed device or related equipment or documents.

5. The government must complete an off-site search of a device that agents removed in order to search for evidence of crime as promptly as practicable and no later than 30 calendar

days after the initial execution of the warrant. Within thirty calendar days after completing an off-site search of a device pursuant to this warrant, the government must return any device, as well as any related equipment or document that was removed from the site in order to complete the search, unless, under the law, the government may retain the device, equipment, or document (1) to preserve evidence, or (2) because the device, equipment, or document is contraband, a forfeitable instrumentality of the crime, or fruit of crime. Within a reasonable period, not to exceed sixty calendar days after completing the authorized search of a device, the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of crime.

The deadlines set forth in this paragraph may be extended by court order for good cause shown.

6. In conducting the search authorized by this warrant, whether on site or off site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

7. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under Fed. R. Crim. P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

8. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

SW00[illegible]4

AO106 (Rev. 5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of
[illegible]

SEVENTEEN PREMISES AS DESCRIBED IN ATTACHMENT A HERETO, AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

Case Number: 5:08mj70772 JL

I, Christopher J. Morondino being duly sworn depose and say:

I am a(n) Special Agent, Immigration and Customs Enforcement and have reason to believe
Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A

in the Northern District of California

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B

which is [illegible]

evidence, contraband, fruits and instrumentalities of the commission of a criminal offense

concerning a violation of Title 18/21 United States code, Section(s) 1962(d), 1959, [illegible]

Racketeering conspiracy
Violent crimes in aid of racketeering
Exportation/attempted exportation of stolen vehicle
Conspiracy to distribute/possess with intent to distribute controlled substances

The facts to support a finding of probable cause are as follows:

See Affidavit

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

Approved As To Form: W.S. Wilson Leung
AUSA

Signature of Affiant

Sworn to before me and subscribed in my presence,

October 20, 2008 at Eureka CA
Date City State

Hon. Nandor J. Vadas U.S. M.J.
Name of Judge Title of Judge

Signature of Judge

SWDOSA

**AFFIDAVIT OF CHRISTOPHER J. MERENDINO**

I, CHRISTOPHER J. MERENDINO, Special Agent of Immigration and Customs Enforcement, being duly sworn, do declare and state:

**I. INTRODUCTION AND QUALIFICATIONS OF AFFIANT**

1. I am a Special Agent with Immigration and Customs Enforcement ("ICE") and have been so employed for approximately 6 years. I am presently assigned to ICE's San Francisco office where I investigate violations of federal law, with a focus on violent crimes and crimes committed by street gangs. During my career with ICE, I have received training on a variety of law enforcement subjects, including violent crimes, gang organizations, narcotics trafficking, criminal procedure, searches and seizures, and the various gangs operating in the San Francisco Bay Area. I have conducted and participated in numerous investigations of violent street crimes and have participated in the execution of numerous search warrants. The information set forth below is based on my own investigation and on conversations I have had with other law enforcement officers — including members of the San Francisco Police Department's Gang Task Force ("GTF") — and from reviewing law enforcement reports, records, and other documents.

2. This Affidavit is made, pursuant to Federal Rule of Criminal Procedure 41, in support of an application for warrants to search the 17 **PREMISES** described in Attachment A hereto (which is fully incorporated by reference herein), all of which are located in the Northern District of California. For the reasons set forth below, I believe that there is probable cause to believe that the **PREMISES** contain evidence, fruits, and instrumentalities of the existence and operation of a violent transnational street gang known as *La Mara Salvatrucha* — commonly known as "MS-13" — in violation of Title 18, United States Code, Sections 1962(d) (racketeering conspiracy), 1959 (violent crimes in aid of racketeering), 553(a) (exportation and attempted exportation of stolen vehicles), and Title 21, United States Code, Section 846 (conspiracy to distribute a controlled substance), among other statutes.

3. The information contained in this Affidavit is based on my own investigation, my conversations with other law enforcement officers and witnesses, and on my review of reports, records, and other documents. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part. In addition, where this Affidavit quotes recorded statements or text, the quoted language is based on preliminary draft transcripts and/or summaries of the recordings and/or text, which generally have been translated from Spanish to English.

4. Moreover, because this Affidavit is submitted for the limited purpose of establishing probable cause for search warrants, I have not included each and every fact known to me relating to the underlying investigation. Rather, I have set forth only the facts that I believe are necessary to support probable cause for the search warrants for the specified 17 **PREMISES**.

## II. BACKGROUND: LA MARA SALVATRUCHA

5. Since roughly in or about 2005, I have been one of the case agents involved in the investigation of MS-13 in the San Francisco Bay Area. Among other things, during this investigation, I have debriefed numerous witnesses — including cooperating sources who were formerly members of MS-13 — about MS-13's practices, organization, and activities. I have also had the benefit of information about the gang provided by GTF officers who, over the years, have come to know personally various self-admitted MS-13 members in the San Francisco Bay Area. I have also traveled to El Salvador — to which most members of MS-13 trace their roots and where many of MS-13's leaders are located — and met with El Salvadoran law enforcement officials about the gang's organization, reach, and operations.

6. Based on my experience, training, and investigation, I know that MS-13 is a street gang that was formed in Los Angeles, California, during the 1980s. MS-13 members principally are of El Salvadoran background, although many members have roots in other countries, such as Honduras and Guatemala. MS-13 has local gangs, or "cliques," located throughout the world. Based on my experience, training, and investigation, I know that there is an MS-13 clique in San Francisco, California, which is centered on 20th and Mission Streets in the Mission District, the members of which call themselves "20th Street" or the "20th Street Clique." I also know that across the Bay from San Francisco, there is another MS-13 clique in the city of Richmond, which is an offshoot of the *Pasadena Locos Salvatrucha* clique from Southern California, commonly known as "PLS."

7. Based on my experience, training, and investigation, I know that members of MS-13 violently clash with members of rival gangs over various issues, including gang pride, control of drug territory, and the right to extort money from others. I know that in San Francisco, MS-13 members claim to be *Sureño* gang members, a term that generally encompasses gang members of Hispanic descent connected to Southern California who were born outside of the United States and who claim blue as their gang color. I know that the principal rival to MS-13 in the San Francisco Bay Area is the *Norteño* gang, which is generally composed of individuals from Northern California who were born in the United States and whose members typically identify themselves by wearing red clothing. Members of MS-13 are required to attack *Norteños* (or perceived *Norteños*) whenever the opportunity arises, and failure to do so is considered cowardice that results in loss of standing within the gang. I also know from my experience, training, and investigation that MS-13 in the San Francisco Bay Area uses violence and the threat of violence to extort or "tax" criminals who operate in areas claimed by MS-13 as its territory, including a loose-knit group of counterfeit identification traffickers known as "miqueros" or "Roteros," as well as street-level, retail drug dealers in San Francisco, particularly those who ply their illicit trade in the Tenderloin District.

8. Based on my experience, training, and investigation, I know that members of MS-13 often publicize and brag about their acts of violence to other members of the gang and gang associates, usually soon after the commission of the act of violence. This practice arises from the fact that greater respect within the gang is given to members who engage in more numerous and more audacious attacks against rival gang members. Thus, not only is it important for an MS-13 member to do "work" or "jale" — i.e., engage in violence against rivals — it is equally

important that violence committed by an MS-13 member be made known to others. In addition MS-13 members often commit acts of violence in groups, both because numbers provide strength and also because numbers provide witnesses who can confirm a member's violent exploits.

9. Based on my experience, training, and investigation, I know that MS-13 members possess an almost cultish devotion to their gang identity. MS-13 members refer to gang meetings as "church" or "mass," and one of the gang's creeds is that a member can only quit MS-13 through death. MS-13 members also typically engage in somewhat extreme demonstrations of their gang affiliation. For instance, members of MS-13 are supposed to tattoo themselves with MS-13 gang symbols -- such as the gang's name in Gothic lettering or a neo-Satanic hand gesture known as "*la garra*," which is supposed to resemble devil horns -- in order to demonstrate their commitment to the gang. (See Attachment C to this Application, which are photographs of tattoos of a jailed 20th Street Clique member). In addition, MS-13 members not only tag public spaces with gang graffiti, they also decorate their residences as well as otherwise non-descript personal possessions -- such as a commonplace chess board — with gang symbols. (See Attachment D to this Application, which are photographs of items seized during the execution of a search warrant on the home of MS-13 member Angel Noel Guevara by the San Francisco Police Department on or about December 30, 2007). Indeed, according to some former members of MS-13, the MS-13 identity is so strong that any MS-13 member who is asked about his gang affiliations (i.e., asked what he "claims") — whether by law enforcement or by members of rival gangs -- is supposed to proclaim his membership in MS-13, even if doing so means certain arrest or death, although, the sources add, discretion generally trumps valor in practice. Still, a member's failure to proclaim one's allegiance when challenged results in loss of prestige within the gang and possible punishment.

## III. MS-13'S EXISTENCE AND ITS CRIMES IN THE SAN FRANCISCO BAY AREA

10. ICE's MS-13 investigation of the past several years has confirmed both (a) the existence of MS-13 in the San Francisco Bay Area as well as (b) the gang's commission of numerous crimes, including murder and attempted murder, narcotics trafficking, and the attempted exportation of stolen vehicles by its members and associates.

### A. Confidential Source Information

11. According to two independent confidential sources ("CS-1" and "CS-2"),[1] MS-13's presence in the San Francisco Bay Area is divided between two cliques. The 20th Street Clique

[1] The information provided by CS-1 and CS-2 has been corroborated through, among other things, consensual recordings, some of which are summarized in this Affidavit, as well as the surveillance of law enforcement agents and the seizure of evidence, including the seizure of several firearms based on tips provided by CS-1 or CS-2. Both sources have received, inter alia, monetary compensation for their information, and both have been promised protection -- including possible sponsorship into the Witness Security Program, if necessary -- for themselves and their loved ones. Moreover, as part of CS-2's cooperation in the MS-13 investigation, CS-2 has pled guilty to racketeering conspiracy pursuant to a cooperation agreement with the

has been in existence in San Francisco since at least the late 1990s, while the PTS Clique has been in existence in Richmond since in or about 2007.

12. According to both CS-1 and CS-2, between roughly 2003 and 2006, Ivan Cerna was the leader of the 20th Street Clique of MS-13. Beginning in or about 2006, however, Cerna's leadership was challenged by younger members who wanted the gang to tax drug dealers and move more aggressively. Thus, by roughly 2007, Cerna stepped down from the leadership of the 20th Street Clique, and Marvin Carcamo and Angel Noel Guevara took control. Carcamo and Guevara pushed MS-13 members to threaten drugs dealers and other criminals in order to extort the payment of money from them.

13. According to both CS-1 and CS-2, the reign of Carcamo and Guevara effectively ended in late 2007, when they were arrested for robbery/bail jumping and attempted murder, respectively. While both still maintain contact from jail with MS-13 members, the day to day leadership of the gang was assumed by Moris Flores, who remains the leader of the 20th Street Clique today.

II. Consensual Recordings

14. Over the years, under the direction of ICE, CS-1 and CS-2 have recorded numerous conversations they had with MS-13 members, as well as of MS-13 gang meetings they attended. For example:

a. On or about August 3, 2005, Ivan Cerna called a meeting of "original gangsters," i.e., senior members of MS-13. During this meeting, Cerna noted, among other things, that the Clique was collecting only about $20 a month and needed to better manage its money; indicated that he was "aware" of the *Norteños* but that they could not do anything about it "because of the police;" the gang needed always to be armed; he sometimes went to talk with members of the 13th Street *Sureños* [another *Sureño* gang], and he would feel "better" if other Clique members accompanied him in case "something happened;" and some of the homies [gang members] were "placing hits" [attacking rivals] all the time, but that others were doing nothing and acted as if they knew everything.

b. On or about August 13, 2005, Ivan Cerna led an MS-13 gang meeting during which, among other things, he reminded the MS-13 rules, including the prohibition against cooperating with law enforcement. Cerna stated that the punishment for "ratting" is death.

c. On or about September 21, 2007, Marvin Carcamo told CS-1 that the police seized a gun from his home and that he suspected there was a "rat" in the gang.

d. On or about November 21, 2007, Marvin Carcamo told CS-1 about an attack that he and about 15 other MS-13 members conducted on *chapulines* [slang for *Norteños*] a

Government, pursuant to which the Government will seek a downward departure on CS-2's behalf at CS-2's sentencing if CS-2 complies with the cooperation agreement.

year or two previously. Among other things, Carcamo reported that he and his "homeboys" were armed with knives and machetes, and shouted "Mara Salvatrucha, fuckers," as they attacked. Carcamo stated that he regretted that neither he nor his fellows had firearms.

e. On or about June 7, 2008, MS-13 member Walter Cruz Zavala recounted the murder of a *nortero* known as "Palas," who, according to police records, was shot in his car on or about May 31, 2008: "They will never find out. . . . Serious shit [PAUSE]. It was very strange, dude, the way he was twitching, he was all like, 'Oop.' The dude was twitching, he was . . . twitching and trembling. After we shot him, I got out of the car and . . . I loaded my gun, dude. You think that he was still going to be alive?"

f. On or about July 24, 2008, MS-13 member Jonathan Cruz-Ramirez told CS-1 that he had a "gut feeling that the police will soon come to [his] house for [him], for all the shit [he] has done." Cruz-Ramirez also noted that "the best feeling is to hear a *chavala* [another slang term for a *Norteño*] screaming, a *chavala* falling to the ground."

g. On or about July 11, 2008, CS-1 called MS-13 member Guillermo Herrera approximately 90 minutes after a *nortero* was shot and killed on 20th and Mission Streets in San Francisco. Among other things, Herrera told CS-1 to stay away from Mission Street because it was "hot" and that because the victim "will not be the last to go."

C. **Evidence of Specific Crimes**

15. ICE's investigation has also developed evidence of specific crimes committed by MS-13 members as part of their agreement to conduct the activities of the MS-13 racketeering enterprise. For example:

a. *October 29, 2005 Shooting of Victim-1, Victim-2, and Victim-3 by Walter Palma*: According to police records, during the evening of October 29, 2005, a gunman in a passing car shot and wounded three individuals standing in the vicinity of Folsom and 22nd Street in San Francisco, near a medical marijuana dispensary. Approximately four days later, the police seized a gun from a car in which MS-13 member Walter Palma was riding as a passenger, and two days after this seizure (after the District Attorney's Office declined to charge Palma) Palma admitted to the police that the gun belonged to him. The gun that the police recovered was later test-fired and the markings it left on casings matched markings on casings found at the scene of the shooting of Victim-1, Victim-2, and Victim-3. In addition, according to CS-2, in or about 2007, Palma stated that at some unspecified time previously, he had shot three *Norteños* outside a marijuana club in the vicinity of Folsom and 22nd Streets.

b. *December 9, 2005 Shooting of Victim-4 by Daniel Portillo*: According to police records, during the afternoon of December 9, 2005, an individual was shot on First Lane in South San Francisco during a fight between two female high school students,

SW0100

one who claimed affiliation with the *Norteños*, the other who claimed affiliation with the *Sureños*. Two witnesses initially identified MS-13 member Daniel Portillo as the shooter from a photographic array. Two additional witnesses identified Portillo from a photographic array as being present during the fight, although those witnesses did not recall seeing him with a gun. Shortly after the shooting, CS-1 reported to law enforcement officers that Portillo had bragged about shooting at some *Norteños*. The police later stopped Portillo, who consented to a swab of his hands, which later tested positive for the presence of gunshot residue.

c. *Attempted Exportation of Stolen Vehicles by Marvin Carcamo, Walter Palma, Rodil Noches, Daniel Gonzalez, and Marlon Lumang from October 2006 through January 2007*: According to both CS-1 and CS-2, members and associates of MS-13 were engaged in the theft of automobiles and automobile parts. Under the direction of law enforcement agents, in or about mid-2006, CS-2 advised members of MS-13 that s/he knew someone who was willing to purchase stolen automobiles for exportation. ICE set up an undercover warehouse in Richmond, California, to receive vehicles, and over the next four months, various MS-13 members and associates delivered 15 stolen automobiles to the undercover agent for the ostensible purpose of export. These transactions are summarized below:

i. October 13, 2006: MS-13 member Rodrigo Molina and MS-13 associate Marlon Lumang delivered a stolen 1998 Honda Civic, VIN 1HGEJ7127WL062810, to the undercover agent.

ii. October 19, 2006: Molina delivered a stolen 1992 Honda Civic, VIN JHMEH9692NS005842, to the undercover agent.

iii. October 19, 2006: MS-13 member Marvin Carcamo and Marlon Lumang delivered a stolen 2000 Honda Civic, VIN 2HGEJ6619YH605469, to the undercover agent.

iv. November 13, 2006: MS-13 member Walter Palma delivered a stolen 2001 Chevy Suburban, VIN 3GNFK16T91G264236, to the undercover agent.

v. November 17, 2006: MS-13 member Rodil Noches and Daniel Gonzalez delivered a stolen 2003 Toyota Matrix, VIN 2T1KR32E54C072265, to the undercover agent.

vi. November 22, 2006: Noches and Gonzalez delivered a stolen 2001 Toyota 4Runner, VIN JT3HN86RX10341372, to the undercover agent.

vii. November 28, 2006: Noches and Gonzalez delivered a stolen 2000 Toyota 4Runner, VIN JT3HN86R7Y0279911, to the undercover agent.

viii. December 1, 2006: Walter Palma and Rodrigo Molina delivered a stolen 2004 Toyota Matrix, VIN 2T1KR32E7YC191597, to the undercover agent.

ix. December 11, 2006: Palma and Molina delivered a stolen 2003 Toyota Matrix, VIN 2T1KR32E03C125683, to the undercover agent.

x. December 11, 2006: Palma and Molina delivered a stolen 2005 Toyota Matrix, VIN 2T1KR32E25C390994, to the undercover agent.

xi. January 2, 2007: Rodil Noches and Daniel Gonzalez delivered a stolen 2002 Toyota 4Runner, VIN JT3GN86R120224003, to the undercover agent.

xii. January 9, 2007: Noches and Gonzalez delivered a stolen 2002 Toyota Tacoma, VIN 5TEGN92N422137331, to the undercover agent.

xiii. January 17, 2007: Noches and Gonzalez delivered a stolen 2001 Toyota Tacoma, VIN 5TEGN92N81Z879763, to the undercover agent.

xiv. January 17, 2007: Noches and Gonzalez delivered a stolen 2003 Toyota Tacoma, VIN 5TEWN72N53Z194342, to the undercover agent.

xv. January 17, 2007: Noches and Gonzalez delivered a stolen 2001 Toyota Tacoma, VIN 5TEGN92N01Z166311, to the undercover agent.

d. *December 26, 2007 Stabbing of Victim-5, Victim-6, and Victim-7 by Angel Noel Guevara*: According to police records, on or about December 26, 2007, three individuals were stabbed by a Hispanic male and woman in two separate locations of San Francisco within a span of roughly 30 minutes. The first victim (Victim-5) reported that as he walked down the street in the vicinity of Shotwell and 24th Streets, a woman gestured for him to approach her. Shortly thereafter, a black car pulled up and a man jumped out and slashed the victim across the face, shouting "MS" during or after the attack. Roughly 30 minutes later, the two other victims (a juvenile male, Victim-6, and a juvenile female, Victim-7) reported that they were waiting at a bus stop in the vicinity of Silver Avenue and Mission Street when a Hispanic male and female who had been waiting at the bus stop with them suddenly attacked them. The male stabbed Victim-6 several times while the female stabbed Victim-7 once in the chest. Victim-7 reported that both attackers shouted "MS" and/or "MS, *puto*!" as they attacked. Victim-5 identified MS-13 member Angel Noel Guevara from a photographic array as the person who slashed him, while Victim-6 and Victim-7 independently identified Guevara from a photographic array as the person who attacked Victim-6.

e. *Narcotics Trafficking of Mauricio Urias, Judith Sosa, John Locaumena Briez, and Jose Antunez in 2006 and 2008*: According to CS-1 and CS-2, MS-13 member Mauricio Urias and his girlfriend, Judith Sosa, are engaged in the distribution of controlled substances. Under ICE's direction, from in or about mid-2006 through in or about early 2008, CS-2 made nine controlled purchases of either methamphetamine or cocaine from Urias, Sosa, Briez and Jose Antunez, as set forth below:

i. May 24, 2006: CS-2 contacted Urias for one ounce of methamphetamine and Urias replied that Sosa and Urias' supplier would be making the delivery. Agents conducting surveillance later saw Sosa and Briez arrive in a car together at the designated meeting place in San Francisco's Mission District and Sosa provided CS-2 with a bag containing what later tested as 5.2 grams of actual methamphetamine for $950.

ii. June 28, 2006: CS-2 contacted URIAS and asked for one ounce of methamphetamine, and Urias agreed to deliver the drugs to CS-2. Agents conducting surveillance saw Urias and Sosa drive from to Hanover Street in Daly City, where they saw Urias get into a pick-up truck that was later determined to be registered to Briez. After Urias left the pick-up truck, he went back to his vehicle and drove to the designated meeting place in San Francisco's Mission District. There, CS-2 entered Urias' car and, according to CS-2, Sosa handed CS-2 a bag containing what later tested as 5.2 grams of actual methamphetamine in exchange for $3,000.

iii. July 11, 2006: CS-2 contacted Urias for two ounces of methamphetamine, and Urias agreed to the sale. Agents surveilled Urias, Sosa, and another MS-13 member, Douglas Largaespada as they drove from Sosa's home to the meeting place in San Francisco's Mission District. There, CS-2 got into Urias' car and, according to CS-2, Sosa handed CS-2 a bag containing what later tested as 10 grams of actual methamphetamine in exchange for $2,000.

iv. January 23, 2007: CS-2 contacted Urias for two ounces of methamphetamine, and Urias agreed and advised CS-2 that Sosa will be making the delivery. At the designated meeting location in San Francisco's Mission District, agents observed Sosa drive up to CS-2 in Urias' car. According to CS-2, Sosa asked CS-2 to go with her to meet her source, but, per law enforcement instructions, CS-2 declined and asked her to return with the drugs instead. Sosa drove off and, shortly thereafter, returned with Briez in the front passenger seat. CS-2 then entered the car driven by Sosa, and, according to CS-2, Briez handed a bag to Sosa, which Sosa handed to CS-2 in exchange for $1,950. The contents of the bag later tested as 44.6 grams of actual methamphetamine in exchange for $1,950.

v. July 31, 2007: CS-2 contacted Urias for two ounces of cocaine and Urias agreed to make the delivery. Agents later observed Urias drive up to CS-2 at the designated meeting location in San Francisco's Mission District and saw CS-2 enter Urias' vehicle and exit after roughly two minutes. CS-2 later reported that Urias provided two bags of what subsequently tested as roughly two ounces of cocaine in exchange for $1,300.

vi. May 31, 2007: CS-2 contacted Jose Antunez for an ounce of cocaine. Antunez agreed to the deal and later met CS-2 in the designated meeting location in San Francisco's Mission District. According to CS-2, Antunez delivered a bag

containing what subsequently tested as approximately one ounce of cocaine for $650.

vii. August 17, 2007: CS-2 contacted Urias for three ounces of cocaine and Urias agreed to deliver the drugs for $650/ounce. Agents later observed Urias drive up to CS-2 at the designated meeting place in San Francisco's Mission District and CS-2 entered Urias' car for approximately three minutes. According to CS-2, while in the car, Urias handed over three bags containing what later tested positive as roughly three ounces of cocaine in exchange for $1,950.

viii. September 14, 2007: CS-2 contacted Urias for nine ounces of cocaine and Urias agreed to make the delivery. Agents later observed Urias drive up to CS-2 in San Francisco's Mission District and saw CS-2 enter URIAS' car, but then Urias unexpectedly drove off. Agents followed Urias' car and saw it parked near a recreation center. At that point, an unidentified Hispanic male exited a black Honda across the street and got into URIAS' car for several minutes. According to CS-2, the Hispanic male entered Urias' car and Urias asked CS-2 for $2,000, which CS-2 provided. Urias then added $500 and gave the money to the Hispanic male, who handed a brown paper bag to Urias. Urias then gave the brown bag to CS-2, which CS-2 later surrendered to agents after the transaction. Laboratory tests subsequently concluded that the brown paper bag contained approximately nine ounces of cocaine.

ix. January 22, 2008: CS-2 contacted Urias and sought four ounces of cocaine, and Urias agreed to make the delivery in San Francisco's Mission District. Agents later observed Urias as he drove from his house located at 378 Forestview Drive in South San Francisco to the meeting place in the Mission District of San Francisco. Agents saw CS-2 enter Urias' vehicle and then exit a few minutes later. According to CS-2, while CS-2 was in Urias' car, Urias handed over a blue bag containing what later tested as roughly four ounces of cocaine in exchange for $2,200.

f. *June 19, 2008 Stabbing of Victim-7 by Abraham Martinez, Jose Alvarado, and Douglas Largaespada*: According to police records, on or about June 19, 2008, a young man riding in his sister's car was attacked by several individuals and almost stabbed to death in the vicinity of 21st and Mission Streets in San Francisco. According to the victim and his sister, three men rushed their car while it was stopped at a traffic light and attacked the victim through the open passenger side window. After reviewing video footage from security cameras mounted at nearby businesses, a GTF officer recognized the assailants as MS-13 members Abraham Martinez, Jose Alvarado, and Douglas Largaespada, each of whom the officer has known for years. The three were subsequently arrested, and although each denied stabbing the victim, Alvarado and Martinez both admitted to rushing the victim's car because they thought that the victim and his sister had called them "scraps," which is a *Norteño* pejorative slang term for *Sureño* gang members. CS-2 also reported that s/he spoke with

Abraham Martinez on the telephone after the stabbing, and Martinez bragged that he, Alvarado, and Longaespada had stabbed a *Norteño*.

g. *July 11, 2008 Murder of Victim 10 by Guillermo Herrera.* According to police records, at approximately noon on or about July 11, 2008, an individual, whom ocal of him reported was a *nortenо*, was killed by a shotgun blast to the head in the vicinity of 20th and Mission Streets in San Francisco. As noted above, according to CS-1 and CS-2, MS-13 has been aggressively trying to "tax" *norteños* who operate in MS-13 territory, which has led to violent confrontations between *norteños* and MS-13 members. In addition, as noted above, approximately 90 minutes after the murder, CS-1 spoke with MS-13 member Guillermo Herrera over the telephone, who advised CS-1 not to go to Mission Street because the area was hot and that the victim will not be the last to fall. Moreover, a witness to the shooting identified Guillermo Herrera as the gunman from a photographic array.

h. *July 31, 2008 Murder of the Juvenile Victim by Walter Chinchilla-Linar, Cesar Alvarado, Marlon Rivera, and Rony Aguilera.* As described in greater detail below, according to witness information and a consensual recording made by CS-1, Walter Chinchilla-Linar and Cesar Alvarado, and juveniles Marlon Rivera, and Rony Aguilera --- all of whom, according to CS-1, are members of MS-13 — participated in the robbery and stabbing death of a juvenile male (the "Juvenile Victim") in the Outer Mission area of San Francisco during the early morning hours of July 31, 2008. Among other things, Chinchilla-Linar, Alvarado, Rivera, and Aguilera bragged about the murder and suggested that they targeted the Juvenile Victim because they thought he was a *Norteño*.

i. *October 12, 2008 Conspiracy to Commit Robbery by Aristides Carcamo and Juan Carcamo.* As described below, according to CS-1, CS-1 (under directions from agents) accompanied Aristides Carcamo and Juan Carcamo -- brothers of jailed MS-13 leader Marvin Carcamo --- to "case" — i.e., conduct surveillance on --- a possible robbery victim. According to CS-1, the brothers Carcamo stated that they received a tip from someone in prison that the intended robbery victim possessed a lot of valuables.

D. **Tangible Evidence Recovered By Law Enforcement**

19. Moreover, during the course of this investigation, federal and local law enforcement officers have executed several search warrants at different locations that have resulted in the recovery of highly probative evidence, including firearms, ammunition, and items confirming the existence of MS-13. For example:

a. On or about July 27, 2006, in Richmond, California, law enforcement officers executed a federal search warrant of the Richmond, California, residence of MS-13 members Jose Bonilla-Lainez (now-deceased) and Sebastian Presas. Among other things, the search officers found a sawed-off 12-gauge shotgun with a defaced serial number, a loaded .38-caliber revolver, [illegible] photographs of individuals [illegible]

personally known to law enforcement officers as MS-13 gang members, and a list containing known MS-13 members with corresponding telephone numbers.

b. On or about May 17, 2007, law enforcement officers executed a state search warrant at the Oakland, California, residence of MS-13 member Marvin Carcamo. Among other things, the search officers found a loaded .380-caliber handgun and a shotgun. Also recovered was a notebook with "MS-13" written on the cover and the word "Activos" written on the first page, and additional entries listing various known gang members, dates, and numbers, suggesting that the notebook was a record of gang meetings and dues paid by members.

c. On or about December 30, 2007, law enforcement officers executed a state search warrant at the San Francisco, California, residence of MS-13 member Angel Noel Guevara. Among other things, the search officers found a variety of knives, ammunition, and documents listing known gang members and numbers, suggesting that the documents were MS-13 rosters and dues sheets. In addition, the residence was decorated with MS-13 graffiti, and various items — including a stun gun and a chess board — were also decorated with MS-13 symbols.

d. On or about May 16, 2008, law enforcement officers executed a state search warrant at the San Francisco, California, home of MS-13 member Manuel Sherman. Among other things, the officers found a .40-caliber Glock semiautomatic handgun.

e. On or about July 25, 2008, law enforcement officers executed a federal search warrant at the San Francisco, California, home of MS-13 member Jonathan Cruz-Ramirez. Among other things, agents found a loaded 9x18 mm Makarov handgun as well as counterfeit immigration documents.

f. On or about August 11, 2008, law enforcement officers executed a federal search warrant at the San Francisco, California, home of MS-13 member Walter Palma and found two loaded .45-caliber handguns, along with additional loaded ammunition magazines.

17. Law enforcement officers have also recovered several firearms as a result of traffic stops and based on information from CS-1. For example:

a. As noted above, according to police records, on or about November 2, 2005, in San Francisco, California, the police stopped a car in which MS-13 member Walter Palma was riding as a passenger because the driver was not wearing a seatbelt. As the officers approached the vehicle, they noticed the muzzle of a gun pointing at them from the moon roof of the car. As they took cover, Palma ran out of the car and was arrested shortly thereafter hiding in a trash receptacle. A 9mm handgun — later linked to the non-fatal shooting of Victim-1, Victim-2, and Victim-3 on or about October 29, 2005 — was found wedged in the moon roof of car. Palma was arrested but initially released without being charged, and following his release, told the police that the gun belonged to him.

b. According to police records, on or about February 22, 2008, the police stopped a car driven by MS-13 member Carlos Garrido in San Francisco's Mission District because of an expired registration, and after the stop, Garrido was arrested for driving without a license. During a subsequent inventory search of the vehicle, the panel in which the car's stereo was installed fell open, and the police found a .22-caliber hand gun hidden in the cavity behind the panel. Garrido pled guilty earlier this year in the Northern District of California to being an illegal alien in possession of the recovered firearm.

c. According to police records, on or about March 31, 2008, in San Francisco's Tenderloin District, the police stopped a car in which MS-13 member Erick Lopez was riding as a passenger for not having a front license plate. As the police approached the vehicle, Lopez ran out of the car and was caught a few blocks away, trying to shove a .45-caliber handgun through a street grate. Test firing of this gun later concluded that it was the same gun that was used to kill two people in the Excelsior District during the early morning hours of March 29, 2008. In addition, according to recordings of Lopez's jail calls, following his arrest, Lopez called his mother and urgently asked her to dispose of gloves he had left in their home.

d. As described below, on or about September 18, 2008, law enforcement officers received information from CS-1 that a handgun belonging to MS-13 was being stashed in a particular part of Dolores Park in San Francisco. Law enforcement officers subsequently recovered a .357-caliber revolver from the Park.

## IV. PROBABLE CAUSE TO SEARCH EACH OF THE PREMISES

18. As set forth above, ICE's investigation to date has developed evidence establishing the existence of the MS-13 enterprise in the San Francisco Bay Area as well as the involvement of various MS-13 members in the commission of a variety of crimes, including murder, attempted murder, narcotics trafficking, and the attempted exportation of stolen vehicles. In addition, as described above, searches conducted at the residences of MS-13 members and associates have yielded highly probative evidence relating to these crimes, including firearms, ammunition, and other weapons, as well as indicia of gang membership, such as photographs of MS-13 members flashing gang signs, photographs of known gang members associating together, MS-13 graffiti, items decorated with MS-13 symbols, clothing, belts, and bandanas featuring the color blue and/or the number thirteen or some combination of numbers that total thirteen, and documents that appear to be MS-13 rosters, contact lists, and dues records.

19. As explained above, based on my training, experience, and investigation, I know that MS-13 members and associates exhibit a fanatical devotion to the gang. Membership in or association with the gang is a prominent part of these individuals' identities, and this dedication is often manifested in dress, tattoos, and behavior. Accordingly, there is probable cause to believe that MS-13 members and associates likely possess items decorated with MS-13 insignias and symbols in their residences, as well as photographs of members and associates, both alive and deceased. In addition, because MS-13 members and associates invest such gang-related items with emotional and psychological value, these items are kept permanently, like other items

with nostalgic value, such as wedding photographs, correspondence with loved ones, or school graduation certificates, and are taken with individuals when they move residences. Indeed, as described below, during a search of the home of MS-13 associate Santos Esperanza in 2005, the police found two albums of photographs of gang members -- some flashing gang signs and others holding firearms -- and some of these photographs were date stamped January 30, 2000, approximately five years prior to the search.

20. Moreover, based on my experience, training, and investigation, I know that individuals engaged in organized criminal activity --- such as the conduct of the MS-13 racketeering enterprise — typically keep and maintain records, documents, weapons, and other "tools of their trade" relating to their enterprise's activities for long periods, if not permanently, independent of any emotional and/or nostalgic value in these items, but simply because such items are needed to conduct their criminal enterprise. For example, based on my experience, training, and investigation (including conversations with other law enforcement officers), I know that drug dealers often keep detailed ledgers and records of their narcotics transactions for long periods because, among other reasons, drug trafficking is often conducted on credit with deals involving many different suppliers and buyers at the same time, and because most drug dealers do not realize the inculpatory nature of such records. Similarly, gang members often maintain possession of firearms, even those that have been used to commit crimes, because guns are hard to replace, and it is better to have a gun that is "dirty" than to have no gun at all. This practice of maintaining the instrumentalities of their crimes enables a criminal enterprise to continue to exist and flourish, especially when the enterprise's members are likely, at one point or another, to be arrested, deported, and/or killed, all of which, based on my experience, training, and investigation, have happened regularly with members of MS-13.[3]

---

[3] The lapse of a substantial amount of time does not automatically preclude a finding of probable cause where the ongoing nature of a crime makes it likely that suspects will maintain evidence of their criminal enterprise. See, e.g., United States v. Alvarez, 358 F.3d 1194, 1204 (9th Cir. 2004) (holding that years old information relating to extensive and long-operating criminal activity can still properly form basis for search warrant if the information was recently corroborated); United States v. Dozier, 844 F.2d 701, 707 (9th Cir. 1988) ("mere lapse of substantial amounts of time is not controlling" where "the ongoing nature of a crime . . . might lead to the maintenance of tools of the trade"); United States v. Landis, 726 F.2d 540, 542 (9th Cir. 1984) ("[t]he continuous nature of the activity diminishes the significance of the time lag between the acts described in the affidavit and presentation of the affidavit to the magistrate"); see also Andresen v. Maryland, 427 U.S. 463, 478 n.9 (1976) (summarily dismissing appellant's claim that information contained in search warrant was stale because the warrant sought documents that reasonably could be expected to be maintained for extended periods of time). "When a police investigation relates to a continuing criminal business, rather than a completed act, courts will permit greater lapses of time between the dates of the activities described in the affidavit and the date of the warrant request." United States v. [illegible], [illegible] F.3d 1155, 1161 (4th Cir. 1999).

21. Furthermore, based on my experience, training, and investigation, I know that MS-13 gang members often keep obviously inculpatory items such as firearms, ammunition, other weapons, and drugs, at the residences of their family members, girlfriends, and non-member associates. Based on my experience, training, and investigation, MS-13 members store these so-called "hot" items in other people's homes because they assume that these (relatively) less suspicious individuals will be less likely to attract police attention, as opposed to self-admitted and tattooed gang members like themselves. In addition, based on my experience, training, and investigation, I know that MS-13 gang members may be called upon to store and/or hide "hot" items such as weapons, drugs, drug paraphernalia, stolen property, and other contraband and evidence in their residences in order to aid other members of the gang.

22. Accordingly, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1962(d), 1959, and 924(c), and Title 21, United States Code, Section 846 — including firearms, ammunition, and other weapons, and indicia of gang membership — such as gang rosters, dues sheets, photographs depicting gang members, gang graffiti, correspondence among gang members, items decorated with gang symbols and insignias, and gang clothing — narcotics, narcotics-related paraphernalia, automobile components, and other items set forth in Attachment B hereto (which is fully incorporated by reference herein) — will likely be found in the **PREMISES**, all of which are the residences of MS-13 members or associates. Based on my experience, training, and investigation, I also know that such items are often kept in closed and locked containers, such as safes and lockers and even vehicles, and authorization is sought to open any closed and/or locked containers and vehicles during the search for these items. Probable cause for each of the **PREMISES** will be addressed individually in the following section, which is based on my own investigation as well as on information I learned from other law enforcement officers and their reports.

**A. PREMISES 1: 815 Hemlock Avenue, South San Francisco, California**

23. 815 Hemlock Avenue in South San Francisco, California, is the present residence of MS-13 member Ivan Cerna. As recently as August 27, 2008, agents conducting surveillance observed Cerna exiting this location and driving away. In addition, Cerna's name is one of the names that appears in PG&E records for the utilities account for 815 Hemlock Avenue.

24. As set forth above, Cerna was the leader of the 20th Street Clique of MS-13 until in or about 2007, and even after relinquishing leadership, Cerna remains active in the management of MS-13. For instance,

a. CS-1 reported that on June 2, 2008, CS-1 accompanied members of MS-13 as they sought to extort the payment of "taxes" from drug dealers in the Tenderloin District of San Francisco. According to CS-1, a leader of the 11th Street *Sureños* Gang, which claimed the Tenderloin District as their territory, complained that MS-13's foray into the Tenderloin District violated an agreement that the 11th Street Sureños made with Ivan Cerna.

d. I learned from other law enforcement officers that on or about June 11, 2008, UTF officers observed Cerna speaking with two known narcos. As the officers approached, the narcos ran off, but Cerna held firm and spoke with the officers, identifying himself as an MS-13 member who is known by the moniker "Tigre." The officers also identified another MS-13 member who was with Cerna, Abraham Martinez.

e. I learned from a report prepared by a fellow ICE agent that CS-1 reported that an MS-13 member stated that on or about June 15, 2008, various MS-13 members were confronted by members of the 11th Street *Sureños* Gang, who expressed their anger that MS-13 was taxing drug dealers in territory claimed by the 11th Street *Sureños*. The leaders of the 11th Street *Sureños* reportedly stated that they recognized Ivan Cerna, Abraham Martinez, and Douglas Largaespada as the only MS-13 members with the authority to impose a tax in 11th Street *Sureños* territory.

f. I learned from CS-2 that on or about June 23, 2008, CS-2 spoke with Cerna on the telephone. During this call, Cerna discussed MS-13 business with CS-2, including the state of the gang's leadership, the murder of the victim known as "Patas," and the June 19, 2008 stabbing of a putative *Norteño* by MS-13 members Abraham Martinez, Jose Alvarado, and Douglas Largaespada.

g. On or about October 15, 2008, under my direction, CS-2 spoke with Ivan Cerna over the telephone. According to CS-2, during this conversation, Cerna stated that he had a conflict with an incarcerated MS-13 member (the "Member") concerning the leadership of the 20th Street Clique. Cerna also noted that there was a federal crackdown on MS-13 because of the "Popeye" incident, i.e., a triple murder in June 2008 for which the suspect charged is PLS member Edwin Ramos who, according to CS-1 and CS-2, is known by the moniker "Popeye."

25. Given Cerna's continued active involvement in the conduct of the MS-13 enterprise, I respectfully submit that there is probable cause to believe that his residence, 855 Hemlock Avenue, South San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

B. **PREMISES 2: 890 Goettingen Street, San Francisco, California**

26. According to California Department of Motor Vehicles records, 890 Goettingen Street in San Francisco, California, is the present residence of MS-13 leader Moris Flores. In addition, agents conducting surveillance observed Flores at the location as recently as September 11, 2008, when he opened the door for an unidentified woman. Flores was also observed exiting the location and locking the door after him with a key.

27. As set forth above, Moris Flores is the present leader of MS-13 and he is active in the conduct of MS-13. For instance

a. According to a GTF officer, on or about May 17, 2008, he saw Flores with several other MS-13 members whom the officer knew throwing gang signs and intimidating motorists in the vicinity of 20th and Mission Streets in San Francisco.

b. According to CS-1, on or about June 2 and 9, 2008, Flores ordered several MS-13 members to collect "tax" money from drug dealers in the Tenderloin District of San Francisco. CS-1 accompanied several other MS-13 members on these expeditions and they collected several hundred dollars from the drug dealers they found.

c. On or about July 11, 2008, a victim was shot and killed in the Mission District at approximately noon, and a witness identified MS-13 member Guillermo Herrera as the gunman. Approximately 48 minutes after the murder, Flores sent a text message from his cellular telephone to Herrera, advising Herrera to "Call Drimer [i.e., "Dreamer," which I know from my investigation is the moniker for MS-13 member Manuel Franco], hide the thing, he is going to bring you guys, and erase the message." Approximately four days later, after Herrera was arrested by the San Francisco Police Department for the July 11 murder, Flores sent text messages to Herrera coaching him on what to tell the police and suggesting exculpatory statements for Herrera: "You no longer go to 20th [i.e., affiliate with the 20th Street Clique], you are in church with your brother, you are changing your life, that's it, you're going to get out okay." "You were at church with your brother in Richmond right? He already knows that they caught you but you guys go to church on Fridays, it's a youth group right?"

d. On or about August 28, 2008, the San Francisco Police Department executed a state search warrant at Flores' prior residence and found, among other things, correspondence with jailed MS-13 leader Angel Noel Guevara. According to a preliminary draft translation of this letter, among other things, Guevara inquired about the status of other gang members, told them to take care of the park that is theirs, which, based on my investigation, I believe referred to Mission Playground, which is claimed by the 20th Street clique as its territory, and stated that he was throwing up "two letters" [i.e., M and S] in jail, which, based on my experience and investigation, I believe meant that Guevara was flashing gang signs and otherwise proclaiming his MS-13 affiliation in jail.

e. According to CS-1, sometime in late August or early September of 2008, CS-1 was with Flores when Flores received a telephone call on his cellular telephone. Flores handed the telephone to CS-1, and on the line was MS-13 member Carlos Carranza. Carranza told CS-1 that MS-13 member Manuel Urbano had questions regarding the seizure by the police of a .40-caliber handgun from Urbano's residence on or about May 16, 2008, and that Urbano suspected that CS-1 provided information to the police that led to the seizure of the gun.

f. According to CS-1, on or about October 10, 2008, s/he was in a park in the Mission District of San Francisco when s/he saw Flores with fellow MS-13 member Giovanni Hernandez. Hernandez walked over to CS-1 and questioned CS-1 about the .357

SWA[illegible]

revolver that was seized from Dolores Park by law enforcement agents on or about September 18, 2008. CS-1 reported that Hernandez insinuated the CS-1 had something to do with the seizure. After CS-1 accounted for him/herself for September 18, 2008, Hernandez left CS-1, returned to Flores, and spoke with Flores.

g. According to CS-1, later, on or about October 10, 2008, Flores advised CS-1 that if MS-13 members Juan Carcamo and Rafael Montoya had any questions regarding what happened to money collected by the gang from the "taxing" of "colgaderos," they should direct their inquiries to MS-13 member Edgardo Cuna, who had previously been designated the 29th Street Clique's treasurer.

h. According to CS-1, on or about October 14, 2008, CS-1 saw Flores with MS-13 members Giovanni Hernandez, Rony Aguilera, and "Rookie" hanging out in front of Flores' home at 890 Goettingen Street.

28. Given Flores' continued active involvement in the conduct of the MS-13 enterprise, I respectfully submit that there is probable cause to believe that his residence, 890 Goettingen Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

C. **PREMISES 3: 1418 Revere Street, San Francisco, California**

29. Based on ICE's investigation, I believe that 1418 Revere Street in San Francisco, California, is the present residence of Walter Chinchilla-Linar, whom CS-1 knows as an MS-13 member who uses the moniker "Demonio." On or about September 24, 2004, agents conducting surveillance saw Chinchilla-Linar exit the location. Moreover, in or about November 2006, Chinchilla-Linar advised ICE agents that his mother was "Hilda Linares," and according to a publicly available commercial database, current to September 2008, a "Hilda Linares" is associated with the 1418 Revere Street address. Furthermore, CS-1 has reported that Chinchilla-Linar lives at 1418 Revere Street.

30. ICE's investigation has revealed that Chinchilla-Linar has been and remains an active MS-13 member. For example:

a. According to CS-1 and CS-2, Chinchilla-Linar regularly attended MS-13 meetings, including meetings on or about July 14, 2006 — when he was jumped into the gang — September 14, 2006, August 23, 2007, August 26, 2007, February 9, 2008, March 1, 2008, and April 29, 2008.

b. On or about March 29, 2008, CS-1 recorded a conversation with Chinchilla-Linar during which he bragged about participating in the shooting of people he described as *Norteño* gang members.

c. A police report prepared by a SFPD Sergeant states that on or about May 17, 2008, Chinchilla-Linar was detained along with five other known MS-13 gang members in the area of Mission and 29th Streets in San Francisco. The reporting officer advised

that he observed the detained individuals, including Chinchilla-Linar, standing shoulder to shoulder facing Mission Street. One of the detainees was observed throwing gang signs at passing vehicles, and others were observed yelling and gesturing at citizens.

ii. According to CS-1, on or about June 2, 2008, Chinchilla-Linar and other MS-13 gang members sprayed MS-13 graffiti in the Mission District of San Francisco and then went to the Tenderloin District to "tax" drug dealers.

31. The current investigation has also revealed that Chinchilla-Linar is culpable in the July 31, 2008 murder of the Juvenile Victim referenced above.

a. According to reports prepared by other law enforcement officers, during the early morning of July 31, 2008, the Juvenile Victim and two of his friends were hanging out in the Outer Mission area of San Francisco when approximately five individuals accosted them. According to one of the Juvenile Victim's friends, one of these individuals made a "devil's horn" gesture with her hand, which the friend recognized to be an MS-13 gang sign. The Juvenile Victim separated from his friends and walked down the street, followed by two or three of the aggressors, while one of his two friends was robbed of a personal music player at knife-point by the others. After the robbery, the Juvenile Victim's friends found the Juvenile Victim lying on the street with what proved to be fatal knife wounds. An i-Pod that the Juvenile Victim had with him was missing.

b. Later on July 31, 2008, CS-1 reported to ICE that Walter Chinchilla-Linar, Cesar Alvarado, and two juveniles, Marlon Rivera and Rony Aguilera — all of whom CS-1 reported are members of MS-13 — bragged about killing a *Norteño* earlier that day. CS-1 recorded the conversation, which included the following statements relating to the murder of the Juvenile Victim.

i. Walter Chinchilla-Linar: "We went hunting [illegible] there last night" but "[we] only caught one deer."

ii. Rony Aguilera: "We stabbed that son of a bitch. The dude just fell and died right in front of, right in front of the homeboy, dog."

iii. In response to an inquiry from CS-1 whether the victim was a "*chavala*," i.e., a *Norteño* gang member, Rony Aguilera replied, "Yes," while Cesar Alvarado replied, "Yeah dude." Cesar Alvarado then added, "Those little fuckers were just asking for it there."

iv. Rony Aguilera: "And the fucker tried to get smart with the dude, I even took his i-Pod."

v. Rony Aguilera: "Boom! I stabbed him, it got stuck and it went in and out here, then this dude stabbed him. Both of us crazy, in and out here, homeboy."

vi. Marlon Rivera: "The dude said to me, he said, 'You should not be checking me. I know you.' That son of a bitch said that to me."

vii. Cesar Alvarado: "And the other, and the other guy, that knife that I had crazy, I just went like this and it went in by itself. I just went like this crazy, look! I didn't even, I didn't even do this and the shit went in by itself, dog."

viii. Rony Aguilera: "I had like a, a Chinese style sword, dog ... And I poked it in crazy, and it just slid in, like that! I even felt that my hand go in, dog ... I stuck it all the way in, dude, right here. Look! ... And we still [unintelligible]. We were following him to stab him even more, dude. I stabbed him, I stabbed him like three times in the heart, and then I stabbed him a bunch of times in the back, crazy."

ix. Marlon Rivera: "Hey, what made me laugh is how he went down. He even closed his legs and then dropped dead, like this. Look! [LAUGHS]"

32. In light of the preceding, including [illegible]-Linar's participation in a recent MS-13 murder, I respectfully submit that there is probable cause to believe that his residence, 1418 Revere Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

**D. PREMISES 4: 1474 Palou Avenue, San Francisco, California**

33. As noted above, Marlon Rivera is a juvenile who, according to CS-1, is a member of MS-13. According to immigration records, Marlon Rivera's residence is 1474 Palou Avenue, and on or about September 10, 2008, agents conducting surveillance observed Rivera entering the location.

34. As set forth above in paragraph 31, Marlon Rivera is an active participant in the conduct of the affairs of MS-13, including the July 31, 2008 gang related murder of the Juvenile Victim. Accordingly, I respectfully submit that there is probable cause to believe that his residence, 1474 Palou Avenue, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

**E. PREMISES 5: Prita Hotel, 2284 Mission Street, 3rd Floor, Room 16, San Francisco, California**

35. As noted above, Rony Aguilera is a juvenile who, according to CS-1, is a member of MS-13. On or about September 1, 2008, the San Francisco Police Department executed a state search warrant at Room 16 of the Prita Hotel located at 2284 Mission Street in San Francisco, California, and found Aguilera along with several other MS-13 members — including Cesar Alvarado, Eduardo Carin, Jaime Balam, and Giovanni Hernandez — there. On or about October

10, 2008, an agent conducting surveillance saw Aguilera enter the Hotel and then exit a short time later wearing different clothing, suggesting that Aguilera still resided in the Hotel.

36. As set forth above in paragraph 11, Tony Aguilera is an active participant in the conduct of the affairs of MS-13, including the July 31, 2008 gang-related murder of the Juvenile Victim. In addition, there is also evidence that the Prita Hotel is being used by Aguilera and other MS-13 members for the distribution of narcotics. During the search of September 1, 2008 referenced above, the police found drug paraphernalia, such as plastic baggies and scales, in Room 16 of the Hotel (although the police found no drugs). In addition, on or about October 15, 2008, CS-1 reported that Aguilera continues to reside in the Hotel with gang members or associates "Piki" and "Rookie." CS-1 also reported that a gang member known as "Sleepy" continues to sell drugs from the Hotel.

37. Accordingly, I respectfully submit that there is probable cause to believe that Room 16 of the Prita Hotel located at 2284 Mission Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

F. **PREMISES 6: 378 Forestview Drive, South San Francisco, California**

38. According to California Department of Motor Vehicle records, 378 Forestview Drive in South San Francisco, California, is the present residence of Mauricio Urias, whom CS-1 and CS-2 know as an MS-13 member with the moniker "Pupper." Agents conducting surveillance observed Urias exiting the location as recently as September 15, 2008.

39. As set forth above, Urias is a member of MS-13 who, along with his girlfriend, Judith Soto, and others, was involved in the distribution of methamphetamine and cocaine. During CS-2's controlled purchase of cocaine on or about January 22, 2008 (described above), agents surveilled Urias leave 378 Forestview Drive and deliver cocaine to CS-2 without making any stops along the way, suggesting that Urias kept cocaine at 378 Forestview Drive. In addition, according to CS-2, later that day, CS-2 was hanging out with Urias when Urias received a call for cocaine. CS-2 accompanied Urias back to 378 Forestview Drive. There, CS-2 saw Urias retrieve an off-white, rock-like substance resembling cocaine from a trap hidden underneath the floor of the house, break off a piece, weigh the piece, and place the substance in bags.

40. In addition, on or about October 15, 2008, under my direction, CS-2 called Urias and spoke with Urias over the telephone. According to CS-2, during this call, Urias stated that he was still in "business," i.e., distributing narcotics, and, when CS-2 asked whether CS-2 could refer an "uncle," i.e., a customer, to Urias, Urias stated that business was "very good" and that CS-2's "uncle" should call him.

41. Accordingly, I respectfully submit that there is probable cause to believe that Urias' residence, 378 Forestview Drive, South San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise and other crimes. In particular, I believe that, at minimum, narcotics ledgers and similar records will be found in Urias' home. In addition, the trap reported by CS-2 should still be in 378 Forestview

Drive, and its discovery would, by itself, be highly probative evidence against Urias and his co-conspirators.

**G. PREMISES 7: 138 Appleton Avenue, San Francisco, California**

42. According to California Department of Motor Vehicle records, 138 Appleton Avenue in San Francisco, California, is the present residence of MS-13 associate Judith Sosa, who is the girlfriend/common-law wife of MS-13 member Mauricio Urias. Agents conducting surveillance observed Sosa and two children entering the location as recently as August 27, 2008, and also saw Sosa alone entering the location by herself the following day. Moreover, a publicly available commercial database lists 138 Appleton Avenue as Sosa's address.

43. As set forth above, Sosa is one of Mauricio Urias' narcotics co-conspirators. As described above, Sosa personally made all four deliveries of methamphetamine to CS-2 that CS-2 ordered from Urias. Moreover, as with Urias' residence, I know from my experience, training, and investigation that drug dealers often keep detailed ledgers and records of their narcotics transactions for long periods of time, and that MS-13 members often keep instruments of their crimes with girlfriends and non-gang member friends in order to avoid law enforcement attention. Furthermore, Urias confirmed to CS-2 on October 15, 2008 that his narcotics business is "very good," so I believe that Sosa likely continues to be involved in narcotics distribution through her boyfriend Urias.

44. Accordingly, I respectfully submit that there is probable cause to believe that Sosa's residence, 138 Appleton Avenue, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise and other crimes.

**H. PREMISES 8: 509 Hanover Street, Daly City, California**

45. According to California Department of Motor Vehicle records, 509 Hanover Street in Daly City, California, is the present residence of John [illegible] Briez, and agents conducting surveillance observed Briez entering the location as recently as August 28, 2008. Moreover, immigration records for Briez list 509 Hanover Street as his address, as does a publicly available commercial database.

46. As set forth above, Briez is the methamphetamine supplier for Mauricio Urias and Judith Sosa. Briez, in fact, was personally present on three of the four methamphetamine sales to CS-2. Significantly, for the second transaction, Urias and Sosa stopped by Hanover Street in Daly City and got into a truck owned by Briez parked on the street before delivering the drugs to CS-2. This behavior suggests that Urias picked up the drugs from Briez before delivering the drugs to CS-2. In addition, as with the residences of Urias and Sosa, I know from my experience, training, and investigation that drug dealers often keep detailed ledgers and records of their narcotics transactions for long periods of time. Moreover, as noted above, on October 15, 2008, Urias told CS-1 that his business was "very good," so I believe that Briez likely continues to be involved in narcotics distribution as Urias' supplier.

47. Accordingly, I respectfully submit that there is probable cause to believe that Baez's residence, 509 Hanover Drive, Daly City, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

I. **PREMISES 9: 856 2nd Avenue, San Bruno, California**

48. According to a publicly available commercial database, 856 2nd Avenue in San Bruno, California, is the present residence of Ever Sosa-Escobar, whom CS-1 and CS-2 know is an MS-13 member with the moniker "[illegible]." In addition, agents conducting surveillance on the location have seen not only Sosa-Escobar at the location, but also Wilfredo Castillo — whom CS-1 and CS-2 know is an MS-13 member with the moniker "[illegible]" — as well, most recently on September 18 and 19, 2008. On both occasions, Sosa-Escobar was observed early in the morning exiting the residence with a juvenile.

49. ICE's investigation has revealed that Sosa-Escobar and Castillo are active in the affairs of MS-13. For instance:

a. On or about April 4, 2005, a [illegible] officer and I field interviewed Castillo, and he admitted to being an MS-13 member.

b. On or about August 25, 2005, CS-1, under the direction of law enforcement agents, purchased a gun from Sosa-Escobar, and Castillo was present during the transaction.

c. According to CS-2, during a late summer evening in 2006, Castillo was driving a car in which CS-2 and several other MS-13 members, including Luis Martinez, were riding. At one point, Martinez reported that he saw a *Norteño* on the street and told Castillo to stop the car. Castillo did so, and Martinez exited the car and approached the putative *Norteño* on foot. CS-2 reported that s/he then heard shots, and Martinez subsequently returned to the car, claiming to have shot the *Norteño*. Castillo drove off.

d. According to CS-2, shortly after this incident, they were driving on the freeway when someone in the car claimed that an individual in a van had flashed gang signs at them. Martinez fired several shots at a nearby van as Castillo drove. Police records indicate that during the evening of on or about September 4, 2006, an individual driving a van on I-280 in San Francisco was injured in the arm by gun fire in what remains an unsolved shooting.

e. According to a South San Francisco Police Department report, Sosa-Escobar was arrested on or about April 28, 2008, in connection with a gang-related altercation which resulted in the seizure of gang paraphernalia from Sosa-Escobar's vehicle. According to the report, Sosa-Escobar, after waiving his *Miranda* rights, admitted that he was an MS-13 member, and that he had stopped his vehicle because the alleged victims were throwing gang signs at him. According to the report, Sosa-Escobar denied involvement in the physical altercations, but admitted one of his passengers

and became involved. According to the report, Sosa-Escobar stated he had been a member of MS-13 since he was 12.

f. According to CS-1, on or about June 21, 2008, Castillo and several other MS-13 members ambushed a Norteño they knew and beat him in the vicinity of 19th and 20th and Capp Streets in San Francisco's Mission District. CS-2 reported that after this incident s/he saw that Castillo had blood on his pants.

g. Further confirmation of Castillo's allegiance to MS-13 is evinced by tattoos, of which I have seen photographs. Castillo has an MS-13 devil's claw ("*la garra*") on his chest and an El Salvador flag on his back.

50. Accordingly, I believe that Sosa-Escobar and Castillo are both active members of MS-13, and I respectfully submit that there is probable cause to believe that the residence they share, 856 2nd Avenue, San Bruno, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

d. **PREMISES 10: 1156 Sutter Street, Apartment 204, San Francisco, California**

51. According to CS-1 and CS-7, Rodrigo Molina is an MS-13 member. According to law enforcement records, Molina is currently on probation in San Francisco and his address of record is 1156 Sutter Street, Apartment 204 in San Francisco, California. Agents conducting surveillance have also observed Molina exiting the apartment complex as recently as September 14, 2008. Molina's probation officers also conducted a probation search of 1156 Sutter Street, Apartment 204, on or about September 18, 2008, and found Molina present.

52. Moreover, ICE's investigation has revealed that Molina has been and remains active in the affairs of MS-13, despite being presently on probation. For instance:

a. As described in greater detail above, Molina delivered, or helped deliver, five stolen vehicles between October and December 2006 for export.

b. According to Molina's criminal records, he was arrested in or about April and August, 2007, for distributing narcotics in the Tenderloin District of San Francisco. Molina subsequently pled guilty to one or both of these charges (it is unclear whether the charges were consolidated).

c. On or about May 1, 2008, GTF officers observed Molina with several other MS-13 members known to the officers, including Walter Cruz Zavala, Douglas Largaespada, Walter Palma, and Abraham Martinez, at Mission Playground. When Molina noticed the police, he and Martinez tried to hide.

d. Further confirmation of Molina's allegiance to MS-13 is evinced by tattoos, of which I have seen photographs, including "SF" with "20th Street" on his back.

53. I therefore believe that Molina is an active member of MS-13, and I respectfully submit that there is probable cause to believe that Molina's residence, 1156 Sutter Street, Apartment 204, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes. Moreover, although the probation search of September 28, 2008 of Molina's residence failed to recover any item of evidentiary value, I believe that the search officers were looking specifically for contraband, such as drugs and firearms, and not correspondence, photographs, and more subtle evidence of the existence of the MS-13 enterprise. Accordingly, I believe that a further search, with a focus on such items, will prove to be fruitful.

K. **PREMISES 11: 9222 MacArthur Boulevard, Apartment C, Oakland, California**

54. According to CS-1 and CS-2, Aristides Carcamo and Juan Carcamo are MS-13 members who are the brothers of jailed MS-13 leader Marvin Carcamo. I learned from police records that on or about October 2, 2008, Juan Carcamo was arrested in Oakland, California, for possession of narcotics, and he provided 9222 MacArthur Boulevard, Apartment C, in Oakland, California as his address. In addition, agents conducting surveillance observed Aristides Carcamo entering and exiting the location on or about October 3, 2008, and saw both Aristides Carcamo and Juan Carcamo exiting the location on or about October 6, 2008.

55. ICE's investigation has revealed that, in addition to being the younger brothers of MS-13 leader Marvin Carcamo, Aristides Carcamo and Juan Carcamo are active MS-13 members in their own right. For example:

a. According to CS-1, Aristides Carcamo has been attending MS-13 meetings regularly since 2006, including meetings in February, March, and late April of 2008.

b. Indeed, CS-1 reported that on or about April 21, 2008, CS-1 met with Aristides Carcamo and two other MS-13 members, and they discussed an upcoming gang meeting scheduled for April 26, 2008. Aristides Carcamo stated that all MS-13 members had to attend the meeting and were required to pay $25 in dues so that the gang can purchase firearms to retaliate against *Norteños* for the shooting death of an MS-13 member, Rafael Santos, who was killed on or about April 18, 2008. Aristides Carcamo then called two members of the PLS clique in Richmond and asked to borrow firearms and stolen vehicles from them in order to carry out the planned attacks against *Norteños*.

c. Between March and May 2008, Juan Carcamo deposited money into the commissary account of his imprisoned brother Marvin Carcamo approximately a dozen times. In addition, during this same time period, Juan Carcamo also deposited money into the commissary account of jailed MS-13 leader Angel Noel Guevara approximately three times.

d. According to CS-1, on or about September 27, 2008, Juan Carcamo spoke with the Member in prison and the Member told Juan Carcamo that MS-13 member Rosa Machez would serve as the conduit of communication for the Member.

c. According to CS-1, on or about October 12, 2008, Aristides Carcamo and Juan Carcamo called CS-1 and proposed that they rob someone together. Under ICE's direction, CS-1 accompanied the Carcamo brothers as they surveilled the potential victim.

56. Accordingly, I believe that Aristides Carcamo and Juan Carcamo are active members of MS-13, and I respectfully submit that there is probable cause to believe that the residence they share, 9222 MacArthur Boulevard, Apartment C, Oakland, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

L. PREMISES 12: 2134 Road 20, Apartment 25, San Pablo, California

57. According to a publicly available commercial database, 2134 Road 20, Apartment 25 in San Pablo, California, is the residence of a Mauricio Lopez. According to CS-1, Lopez is a high-ranking member of MS-13's PLS clique in Richmond, California, who uses the moniker "Triste." Lopez shares his residence with his longtime girlfriend/common-law wife, MS-13 associate Suemie Esperanza, whom CS-1 and CS-2 know by the moniker "La Gata." Agents conducting surveillance of the location as recently as September 23, 2008 observed Esperanza open a gate to allow a car driven by Lopez into the parking lot of 2134 Road 20. In addition, agents observed Esperanza approach Apartment 25 of the complex and then emerge about 30 minutes later wearing different clothes and appearing to be freshly showered.

58. As detailed below, ICE's investigation has revealed that Lopez and Esperanza are involved in the conduct of the affairs of the PLS clique of MS-13. In addition, prior contacts between Lopez and Esperanza with law enforcement have resulted in the discovery and seizure of MS-13-related paraphernalia. For example:

a. On or about November 23, 2005, members of the Richmond Police Department went to the (then) home of Suemi Esperanza (which was different from her present home in San Pablo) during the course of investigating a gang-related homicide that happened in front of Esperanza's home and received Esperanza's consent to search her house. Among other things, the police noticed that the walls of Esperanza's home were covered with MS-13 symbols, including the MS-13 motto "Mata Roba Viola Controla" — which translates in sum and substance to "Kill Steal Rape Control" — and photographs of MS-13 members. The police also recovered two photo albums containing photographs of various gang members, including some in which the members were throwing gang signs and holding firearms. Based on date stamps on some of the photographs, some of the photographs appear to have been taken as early as January 20, 2000.

b. CS-1 reported that in or about February 2008, CS-1 visited an apartment shared by Lopez and Esperanza in Richmond, California. CS-1 reported that several MS-13 gang members lived in the same apartment complex with the couple, and they disassembled stolen automobiles at the complex to sell as parts on the black apartment.

c. According to CS-2, on or about February 22, 2006, MS-13 member Angel Noel Giovanni expressed his concern that "Trista" of PLS [Lopez] was going to report to MS-13 leaders in Los Angeles that the 20th Street Clique could not deal with a suspected informant within the 20th Street Clique. Giovanni was concerned that gang leaders in Los Angeles would lose faith in the 20th Street Clique's leadership as a result of Lopez's complaint. CS-2 reported that several months later, in or about May 2006, Lopez and other members of PLS demanded that the 20th Street Clique be taken over by a strong leader from El Salvador because the local leadership was mismanaging the clique.

d. According to recordings of prison calls, Esperanza spoke four times on or about May 27, 2008 with an MS-13 member who was detained pending deportation proceedings. According to draft transcripts of these calls, the two did not explicitly discuss MS-13's illegal activities, but did refer to various members of MS-13, including "Spooky," "Popeye," and "Flaco," who, based on my investigation, I know to be monikers for MS-13 members Erick Lopez, Edwin Ramos, and Marvin Carcamo, respectively.

e. According to CS-1, Lopez presently lives with other PLS members on Road 20 in San Pablo, which is used as a hang-out for the members of PLS. CS-1 reported that the gang members live in two apartments, one on the second floor, one on the third floor of an apartment complex, and that gang members on bikes are posted around the complex as look outs for police and rival gang members.

59. Accordingly, I respectfully submit that there is probable cause to believe that 2154 Road 20, Apartment 25 in San Pablo, California, which is the residence of PLS member Mauricio Lopez and his girlfriend/common law wife, MS-13 associate, Stefanie Esperanza, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes. Indeed, given that in 2005, the police recovered highly probative evidence saved over a long period of time from another residence inhabited by Esperanza, I believe that 2154 Road 20, Apartment #25 will likewise prove to be a repository of MS-13 memorabilia.

**M. PREMISES 13: 133 Arleta Avenue, San Francisco, California**

60. According to California Department of Motor Vehicles records, 133 Arleta Avenue in San Francisco, California, is the present address for Rodil Nochez. In addition, agents conducting surveillance also observed Nochez arriving at 133 Arleta Avenue in a car and entering the location.

61. ICE's investigation has revealed that Nochez is a long-standing and still active MS-13 member. For example:

a. According to police records, on or about February 4, 1998, Nochez was arrested in San Francisco after the police seized a loaded handgun from him. Nochez explained that he needed the gun for protection, and also claimed that he was an "ex"-MS-13 member.

b. According to CS-1, Nochez attended at least two MS-13 meetings in 2007. In addition, after CS-2 advised members of MS-13 that CS-2 knew someone who was interested in buying stolen cars for export, Nochez delivered eight stolen vehicles to the undercover agent posing as the exporter between mid-November 2006 and mid-January 2007.

c. According to CS-2, in or about June 2008, CS-2 spoke with Nochez on the telephone, and during this call, Nochez reported that he was in contact with another MS-13 member — the Member referenced above — who was in prison. As noted above, on or about on or about September 27, 2008, Juan Carcamo called this same imprisoned MS-13 member, who told Carcamo that Rodil Nochez would serve as the conduit of communication for the Member.

d. According to the common-law wife of CS-2, in or about August 2008, she was contacted by an MS-13 leader in El Salvador who threatened her if she did not provide him with CS-2's whereabouts. A few weeks after that telephone call, the common-law wife received a telephone call from Nochez who wanted to know where CS-2 was located. Nochez also told the common-law wife that he had recently spoken to the same leader in El Salvador who had previously called CS-2's common-law wife.

e. On or about October 15, 2008, under my direction, CS-2 called Nochez and spoke with him on the telephone. According to CS-2, during this call, Nochez stated that he was still in touch with the Member in prison and provided to CS-2 a telephone number at which the Member can be reached.

62. Accordingly, I believe that Nochez continues to be an active MS-13 member and, as a result, would likely possess MS-13-related paraphernalia in his residence. I therefore submit that there is probable cause to believe that Nochez's residence, 131 Arleta Avenue, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

**N. PREMISES 14: 604 Burrows Street, San Francisco, California**

63. According to a publicly available commercial database, 604 Burrows Street, San Francisco, California, is the residence of Jose Espinal, whom CS-1 has reported to be an MS-13 member with the moniker "Chiqui." In addition, on or about September 11, 2008, agents conducting surveillance on MS-13 leader Moris Flores observed Flores drive by 604 Burrows Street and pick up Espinal. Similarly, on or about September 15, 2008, agents conducting surveillance observed Espinal being dropped off in the vicinity of 604 Burrows Street by MS-13 leader Moris Flores, and subsequently entering the location.

64. ICE's investigation has revealed that Espinal is active in MS-13 affairs and that his residence likely contains evidence, fruits, and instrumentalities of the crimes under investigation. For example:

a. As noted above, Espinal has been observed in the company of MS-13 leader Moris Flores. Also, CS-1 has reported that Espinal has the letters "MS" tattooed across his upper back.

b. According to CS-1, "Hueso" attended numerous gang meetings, including meetings on or about March 1, 8, and 15, 2008, and April 27, 2008.

c. On or about April 1, 2008, CS-1 met with various MS-13 gang members, including Espinal, and discussed a wave of violence that had occurred over the weekend. CS-1 reported that Espinal and the others claimed to have been involved in one of the shootings. CS-1 also reported that Espinal bragged about being involved with another gang member in a recent shooting.

d. As noted above, a police report prepared by a GTF Sergeant states that on May 17, 2008, Espinal (spelled as "Espino" in the report) was detained along with five other MS-13 gang members whom the Sergeant knew in the area of Mission and 19th Streets in San Francisco. The reporting officer advised that he observed the detained individuals, including Espinal, standing shoulder to shoulder facing Mission Street. One of the detainees was observed throwing gang signs at the vehicles and others were observed yelling and gesturing at citizens.

e. On or about September 18, 2008, CS-1 reported that CS-1 was accompanying MS-13 member Rony Aguilera to Espinal's residence at 604 Burrows Street to pick up a firearm. In response, agents set up surveillance and observed Aguilera exit 604 Burrows Street with a backpack. Aguilera then got into a taxi in which CS-1 was already waiting, which took them to Dolores Park. Agents then observed Aguilera walk to the west side of the Park and go under a footbridge. Approximately 45 minutes later, agents went to the footbridge where Aguilera was and recovered a firearm in a hole near the footbridge.

65. Accordingly, I believe that Espinal is an active MS-13 member and that he would likely possess MS-13-related paraphernalia in his residence. I therefore submit that there is probable cause to believe that Espinal's residence, 604 Burrows Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

O. PREMISES 15: 970 Ingerson Avenue, San Francisco, California

66. I learned from reviewing a San Francisco Police Department search warrant affidavit from August 2008 that Giovanni Hernandez has reported to the police that he resides at 970 Ingerson Avenue in San Francisco, California, and that California Department of Motor Vehicles records lists the 970 Ingerson Avenue address as Hernandez's address. Moreover, according to the search warrant affidavit, Hernandez has had at least 11 contacts with the police in the prior 8 months, and on each occasion, he advised the police that he lived at 970 Ingerson Avenue.

67. According to CS-1, Hernandez is an active MS-13 member who uses the moniker "Candel" and who attended gang meetings on or about August 11, 2007, February 2 and 16, 2008, March 1 and 15, 2008, and April 27, 2008. In addition, CS-5 reported that Hernandez was part of a group of MS-13 members who, on June 2, 2008, after spraying MS-13 graffiti in the Mission District, followed the orders of Moris Flores and went to the Tenderloin District and "taxed" drug dealers.

68. In addition, I learned from a LETF officer that on or about August 29, 2008, the San Francisco Police Department executed a search warrant at 970 Ingerson Avenue to look for evidence relating to the shotgun murder of a victim on July 11, 2008, in which the principal suspect is MS-13 member Guillermo Herrera. In a closet in Hernandez's room at 970 Ingerson Street, the police found a box of approximately 200 shotgun shells along with an envelope on which was written the name "Guillermo Herrera."

69. In addition, as noted above, CS-5 reported that on or about October 31, 2008, Hernandez questioned CS-1 about a .357 revolver that was seized from Dolores Park by law enforcement agents on or about September 18, 2008. CS-1 reported that Hernandez insinuated that CS-1 had something to do with the seizure and, after CS-1 accounted for him/herself for September 18, 2008, Hernandez left CS-1, returned to Flores, and spoke with Hernandez.

70. Accordingly, I believe that Hernandez is an active MS-13 member and that he would likely possess MS-13-related paraphernalia in his residence. In addition, based on my experience, training, and investigation, I believe that since the August 29, 2008 search of Hernandez's residence by the San Francisco Police Department, Hernandez likely has acquired additional gang indicia because he was not arrested or charged with any crime after the search and appears undeterred from openly associating with MS-13's present leader, Moris Flores. I therefore submit that there is probable cause to believe that Hernandez's residence, 970 Ingerson Avenue, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

### P. PREMISES 16: 1201 Hollister Street, San Francisco, California

71. According to CS-1, Manuel Umana lives on Hollister Street in San Francisco, California, and on or about October 14, 2008, law enforcement officers conducting surveillance observed Umana at 1201 Hollister Street, leaning outside a second-story window while watching an unrelated police incident on the street.

72. According to CS-1 and CS-2, Umana is an active MS-13 member of the PLS clique who uses the moniker "Lalo" and this investigation has implicated him in the activities of MS-13. For example:

a. I learned law enforcement records that on or about May 14, 2008, based on a tip from CS-7, members of the Richmond Police Department stopped a blue Mustang automobile driven by Umana, conducted a search of the trunk, and found a machete and an AK-47-type assault rifle.

b. According to CS-1, several recent MS-13 gang meetings were held at Umana's residence on Hollister Street. The dates of these meetings were January 28, 2008, February 2, 2008, February 9, 2008, and May 14, 2008. In addition, according to CS-1 and CS-2, Umana has been active with MS-13 since at least mid-2006. Indeed, according to CS-2, Umana was punished ("checked") by the gang in or about September 2006 for disrespecting the 20th Street Clique in the presence of PLS members, according to CS-2.

c. I learned from the San Francisco Police Department that on or about May 16, 2008, the police executed a state search warrant at Umana's home and found, among other things, a .40-caliber semiautomatic Glock handgun, a blue jersey and several blue bandanas, which, as noted above, are articles of clothing that MS-13 members use to signal their gang affiliation, and a t-shirt printed with "RIP MAYITA." I know from my investigation that "Mayita" was one of the monikers of MS-13 member Rafael Santos, who was shot to death on or about April 16, 2008 in the Mission District, reportedly by a Norteño gang member. Accordingly, I believe that, consistent with MS-13 practice, the "RIP MAYITA" t-shirt was a tribute to a fallen comrade.

d. As noted above, according to CS-1, sometime in late August or early September of 2008, CS-1 was with MS-13 leader Marvin Flores when Flores received a telephone call from MS-13 member Carlos Carranza. Carranza then spoke with CS-1 and advised CS-1 that Manuel Umana had questions regarding the seizure by the police of a .40-caliber handgun from Umana's residence on or about May 16, 2008, and that Umana suspected that CS-1 provided information to the police that led to the seizure of the gun.

73. Accordingly, I believe that Umana is an active MS-13 member and that he would likely possess MS-13-related paraphernalia in his residence. In addition, as with Giovanni Hernandez, I believe that because roughly five months have elapsed since the police search of May 16, 2008 and Umana has suffered no consequences for possession of the Glock handgun, Umana likely feels safe to resume his gang activities. I therefore submit that there is probable cause to believe that Umana's residence, 1201 Hollister Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

## Q. PREMISES 17: 133 Lisbon Street, San Francisco, California

74. According Lexis-Nexis, 133 Lisbon Street in San Francisco, California, is the current address for Yesenia Perez-Hernandez. Lexis-Nexis also lists Carlos Garrido — whom CS-1 and CS-2 both identified as a member of MS-13's PLS clique with the moniker "Tweety," and who is presently incarcerated after pleading guilty to a federal gun charge — as a resident of this address. Moreover, on or about September 19, 2008, agents conducting surveillance saw Perez Hernandez exit the location, and then saw her enter the location approximately 30 minutes later. Furthermore, shortly after midnight on or about October 15, 2008, Perez-Hernandez was arrested for felony possession of stolen property, and she advised the police that her address is 133 Lisbon Street in San Francisco.

75. According to CS-1, Yesenia Perez-Hernandez is an MS-13 associate who uses the moniker "Diablita." She has been associated with MS-13 for a number of years as evidenced by her relationships with several MS-13 members known to GIT officers and me, i.e., Mauricio Martinez, a/k/a "Diablito" (who was deported from the United States several months ago) and imprisoned PLS member Carlos Garrido, a/k/a "Tweety," with each of whom she has a child. In addition, according to California Department of Motor Vehicle records, MS-13 gang member Aristides Carcamo lists 133 Lisbon Street as his residence of record, notwithstanding the fact that surveillance and recent police contacts (described above) has established Carcamo's residence at 9222 Macarthur Boulevard, Apartment C, in Oakland. Indeed, on or about October 1, 2008, when Aristides Carcamo bailed out his brother Juan after Juan Carcamo was arrested, he used Perez-Hernandez's address at 133 Lisbon Street as his address of record for the bail forms. Thus, I believe that 133 Lisbon Street is being used as a gang address/safe house.

76. Moreover, on or about October 15, 2008, under the direction of law enforcement, CS-2 spoke with Perez-Hernandez on the telephone. According to CS-2, during that call, Perez-Hernandez stated that she just made bail (according to law enforcement records, Perez-Hernandez was arrested at approximately 12:41 am on October 15, 2008 for felony possession of stolen property). Perez-Hernandez also stated that she has been hanging out with 20th Street members, including "Slow," which I know from my investigation is one of the monikers for 20th Street Clique leader Moris Flores.

77. Accordingly, I believe that Yesenia Perez-Hernandez is an MS-13 associate and that she would likely possess MS-13-related paraphernalia in her residence, which she lets MS-13 members use as their addresses. I therefore submit that there is probable cause to believe that Perez-Hernandez's residence, 133 Lisbon Street, San Francisco, California, presently contains evidence, fruits, and instrumentalities relating to the existence and activities of the MS-13 enterprise, as well as other crimes.

## V. REQUEST FOR AUTHORIZATION TO SEARCH AT ANY TIME OF DAY OR NIGHT

78. As described above, the **PREMISES** to be searched are all residences of either MS-13 members or associates, who, based on my experience, training, and investigation, tend to be violent and armed and contemptuous of law enforcement. MS-13 members and associates romanticize violence for its own sake, and their reputations within the gang are enhanced if they display audacity. In addition, based on my experience, training, and investigation, MS-13 members and associates communicate rapidly with each other, especially regarding any law enforcement operations directed against any of them. Accordingly, I respectfully submit that there is reasonable cause justifying execution of the requested search warrants at any time of day or night so that law enforcement officers can execute the searches during the early morning hours, when any occupants of the **PREMISES** will likely be asleep. This would minimize the risk of detection of the search teams, which, in turn, would enable the search teams to swiftly secure each of the **PREMISES**, therefore ensuring the safety of the officers, of any occupants of the **PREMISES**, and of the public, as well as lessening the opportunity for the occupants of the **PREMISES** to destroy evidence.

## VI. REQUEST TO SEAL THIS AFFIDAVIT AND THE SEARCH WARRANTS

79. I believe that should the contents of this Affidavit and the requested search warrants be made public, it would jeopardize this investigation and increase the risk of danger to any personnel assigned to or cooperating in this investigation. In addition, should the existence of this Affidavit and the search warrants be disclosed, MS-13 members and associates would likely be prompted to destroy or hide evidence, notify co-conspirators, or flee from prosecution. Therefore, for the foregoing reasons, and because this is an ongoing investigation, I respectfully request that this Affidavit and the requested search warrants be sealed until further order of the Court.

## VII. CONCLUSION

80. For the foregoing reasons, I respectfully submit that there is probable cause to believe that the PREMISES presently contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1962(d), 1959, and 551(a), and Title 21, United States Code, Section 846, among other statutes, and I therefore request warrants to search the PREMISES for the items set forth in Attachment B hereto.

CHRISTOPHER J. MERENDINO
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me
this 20 day of October, 2008

HONORABLE NANDOR J. VADAS
UNITED STATES MAGISTRATE JUDGE