1  **NINA WILDER (CSBN 100474)**
   **Law Offices of WEINBERG & WILDER**
2  **523 OCTAVIA STREET**
   **SAN FRANCISCO, CALIFORNIA 94102**
3  **Telephone:  (415) 431-3472**
   **Facsimile:   (415) 552-2703**
4
   Attorneys for Defendant
5  DANIEL GONZALEZ

6  **SETH P. CHAZIN (CSBN 133777)**
   **LAW OFFICES OF SETH P. CHAZIN**
7  **ATTORNEY AT LAW**
   **1164 SOLANO AVENUE**
8  **ALBANY, CA 94706**
   **TELEPHONE: (510) 507-8100**
9  **FACSIMILE: (510) 525-0087**

10 Attorneys for Defendant
   RODIL NOCHEZ
11

12                    UNITED STATES DISTRICT COURT
13
14              FOR THE NORTHERN DISTRICT OF CALIFORNIA

15 UNITED STATES OF AMERICA,   )        **No. CR-08-0730-WHA**
                               )
16         Plaintiff,          )
                               )
17                             )
   DAN1EL GONZALEZ             )
18 and RODIL NOCHEZ,           )
                               )      Date:   January 19, 2010
19         Defendants.         )      Time:  2:00 p.m.
   _____ )      Courtroom:  No. 9, 19th Floor
20

21      **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS**
        **INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT**
22

23

24

25

26

27

28

   DF'T S' MOTION TO DISMISS INDICTMENT
   (CR-08-0730-WHA)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO:  CLERK, UNITED STATES DISTRICT COURT, JOSEPH P. RUSSONIELLO, UNITED STATES ATTORNEY AND W. S. WILSON LEUNG, ASSISTANT UNITED STATES ATTORNEY:**

PLEASE TAKE NOTICE that on January 19, 2010 at 2:00 p.m., or as soon thereafter as the matter may be heard, defendants Daniel Gonzalez and Rodil Nochez will and do move this Court, the Honorable William H. Alsup presiding, for an order dismissing the indictment for outrageous government conduct, or alternatively, for further discovery in support of this motion.

### INTRODUCTION

Defendants Gonzalez and Nochez are jointly charged in the Third Superceding Indictment with eight counts of violating 18 U.S.C. § 553(a), attempted exportation of stolen vehicles (Counts 50, 51, 52, 56, 57, 58, 59, 60).  Each count corresponds to a stolen vehicle allegedly delivered to undercover agents by defendants Gonzalez and Nochez between November 2006 and January 2007.

The storefront sting operation was jointly conducted by ICE and No FEAR, the Northern Foreign Export and Recovery team, a unit of the California Highway Patrol.  (Exhibit A.)  In August 2006, No FEAR and ICE members set up a warehouse in North Richmond which, during a six month period, induced and encouraged the theft of 16 vehicles from innocent citizens.[1]  (Exhibit A, Annex A.)  None of the vehicles were returned to their legal owners.[2]  Instead, once the operation was closed in February 2007, the vehicles were stored – at the direction of the United States Attorney – on a lot pending indictment.  (Exhibit A; Declaration of Counsel.)

The sting, which was part of Operation Devil Horns, investigating MS-13, was put in motion when Confidential Informant 1218 ("1218") was directed to solicit gang members to steal automobiles.  1218 claimed to have connections, the undercover agents, who were exporting stolen vehicles to El Salvador.  Some of the people 1218 successfully solicited –

---

[1] The indictment charges the attempted exportation of 15 – not 16 – vehicles.

[2] CHP records indicate that three of the stolen vehicles were eventually released to insurance companies in March 2008. (Exhibit B.)  Defendant has no information regarding the return of any other vehicles.

1    notably,

2    defendants Gonzalez and Nochez – were not gang members, however – just persons he knew.

3           In July 2006, 1218 was arrested on auto theft charges and he was arrested again for auto

4    theft – and convicted – in November 2007.  He was an experienced car thief, who  participated in

5    many, if not all, of the thefts in this case.  Over the course of the operation, 1218 and the

6    undercover agents regularly solicited the theft of additional, valuable vehicles, while knowing

7    that there would be actual victims whose vehicles would be stolen and held indefinitely.  The

8    operation continued even after it was clear that the automobile thefts were solely for personal

9    gain and had nothing whatsoever to do with MS-13.

10          In short, the agents, and their agent, CI 1218, created and then perpetuated criminal

11   conduct at the expense of innocent victims for no justifiable purpose.  That is the essence of

12   outrageous government conduct.

13                                         **ARGUMENT**

14                                               **I.**

15   **DEFENDANTS ARE ENTITLED TO DISMISSAL OF THE CHARGES
     AGAINST THEM BECAUSE THE GOVERNMENT ENGAGED IN**
16   **OUTRAGEOUS CONDUCT IN VIOLATION OF DUE PROCESS
     WHEN IT DELIBERATELY CAUSED HARM TO INNOCENT**
17   **CITIZENS**

18          The government engages in outrageous conduct in violation of the Due Process Clause

19   when its conduct "would encourage and condone direct and deliberate harm to others."  *See*

20   *United States v. Williams*, 547 F.3d 1187, 1201 n. 11 (9th Cir. 2008), citing *Hampton v. United*

21   *States*, 425 U.S. 484, 493 (1976) (Powell, J., concurring in the judgment).  In *Williams*, the

22   government argued and the court concurred that Justice Powell, in defining a constitutional limit

23   on government involvement in crime, was referring to a situation where" the government

24   prosecuted a defendant for robbery after encouraging the defendant to rob a victim.  *Id.*; *see also*

25   *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971) (holding that, while entrapment was not

26   warranted, law enforcement was so embroiled in the criminal activity that outrageous

27   government conduct required dismissal of the charges); *United States of America v. Twigg III*,

28

DF'T S' MOTION TO DISMISS INDICTMENT
(CR-08-0730-WHA)

                                                  3

588 F.2d 373 (3d Cir. 1978) (holding that dismissal was warranted where the government "sowed the seeds of criminality and lured the defendant into criminality). The standard is met when the "government "engineer[s] and direct[s] a criminal enterprise from start to finish." *United States v. Gurolla*, 333 F.3d 994, 950 (9th Cir. 2003) quoting *United States v. So*, 755 F.2d 1350, 1353 (9th Cir. 1985). The standard is not met when the government merely infiltrates an existing organization, approaches persons already engaged in the conspiracy, or provides valuable and necessary items to the venture. *Id*.

Thus, the case law conceives of two kinds of outrageous government conduct: the first occurs, as articulated by Justice Powell, when the government promotes actual harm to innocent persons. The second, the more typical case, occurs when, although no persons are harmed, the government's involvement in the criminal activity is excessive or shocking. *See United States v. Russell*, 411 U.S. 423, 431-32 (1973); *So*, 755 F.2d at 1353 (a conviction may be overturned "[e]ven when a defendant is predisposed to commit an offense, if the government is so involved in the criminal endeavor that it shocks our sense of justice and violates due process"). This case presents both types of outrageous conduct.

The cases in this area focus primarily on the latter type of misconduct since, unlike here, most undercover operations are designed to cause no actual harm to the public. In *Greene*, the court found outrageous government conduct where the government agent contacted the defendant, urged him to run an illegal still, provided materials for the still, employed veiled threats to keep the still running and was the *sole customer*. 454 F.2d 783; *see also Twig III* (outrageous government conduct found in a methamphetamine manufacturing case where informant supplied all the expertise and the government supplied the chemicals and the site for the laboratory); *United States v. West*, 511 F.2d 1083 (3rd Cir. 1975).

Claims of outrageous government conduct have been rejected, in contrast, where the government merely inserts informants and undercover agents into ongoing criminal enterprises.

*See, e.g.*, Williams, 547 F.3d at 1199-1201 (no outrageous government conduct where sting

1    operation substituted a fake stash house robbery for the bank robbery planned by the defendant);

2    *Gurolla*, 333 F.3d at 950 (no outrageous government conduct where Customs Service

3    established a fictitious business and several undercover bank accounts used to wire transfer

4    funds to Mexican banks involved in money laundering); *United States v. Mayer*, 503 F.3d 740,

5    754-55 (9th Cir. 2007) (no outrageous government conduct where the FBI constructed a fake

6    travel agency, and the undercover agent lied about arrangements he had made for a group to

7    vacation outside the United States to have sexual access to young boys: "[the agent] engaged in

8    *fictional* criminal conduct and lied about being able to facilitate access for [the defendant].[3]").

9        In the instant case, there was no existing car theft – much less, car exportation – ring or

10   enterprise, ready to be infiltrated.  Instead, the government induced an assortment of diverse

11   individuals to participate in a criminal scheme which would not have existed except for the

12   expertise, plans and facilities furnished by the informant and undercover agents.  As such, the

13   standard for outrageous conduct is met here because the government "engineer[ed] and

14   direct[ed] a criminal enterprise from start to finish."

15       It should be noted that none of the cited cases, unlike here, involved the infliction of any

16   harm on innocent persons as part of the undercover operation.  No contraband was distributed to

17   the public in either *Greene* or *Twigg III*.   No robbery occurred in *Williams*.  No sexual tourism

18   occurred in *Mayer* and only government money was laundered in *Gurolla*.  But, 16 automobiles

19   were actually stolen in this case and then withheld from their owners at the government's

20

21

22   ─────────────────

23       [3]In *Mayer*, the defendant also argued that the government improperly "manufactured
     federal jurisdiction."  503 F.3d at 755, citing *United States v. Archer*, 486 F.2d 670 (2nd Cir.

24   1973); *United States v . Coates*, 949 F.2d 104, 106 (4th Cir. 1991) (dismissing indictment where
     interstate element was contrived by the government for the sole purpose of creating federal

25   jurisdiction).  The court rejected *Mayer*'s claim that interstate travel was an integral part of the
     plan and the crime itself.  *Id.* (members of NAMBLA were known to travel to foreign countries

26   to obtain access to young boys).  Here, by contrast, the representation that the vehicles would be
     shipped to El Salvador was extraneous to the thefts themselves, which were state crimes, and

27   was introduced by the government for the sole purpose of creating federal jurisdiction.

28

instigation and direction.[4]

There is no doubt that the government encouraged and the informant participated in the actual theft of automobiles.[5]  That the sting was deliberately designed to inflict harm on a large number of innocent citizens is inexplicable, as well as inexcusable.  Unquestionably, the agencies involved in the operation, particularly the CHP, had in their lawful possession numerous impounded, unclaimed, forfeited or unmarked vehicles which could have been "stolen" to satisfy the elements of § 553(a).   Even more inexplicable is that the government compounded the harm by deciding to warehouse the vehicles pending indictment, instead of returning the vehicles to their legal owners to minimize the inconvenience, stress and financial hardship resulting from the thefts.

Sixteen times 1218 and the agents solicited the actual theft of a vehicle.  The agents themselves encouraged the theft of more, higher value automobiles.  For example, on a body wire recorded on October 19, 2006, one of the undercover agents complained about the age and make of the stolen automobile, a 1992 Honda Civic and asked to "buy, ah, a different one . . . . One that is not a Honda."  (Exhibit D, Bates T000621.)[6]   In a related conversation, the undercover agent stated that "if he brings something better, they'll pay it better . . . . A truck is good and an SUV is good you know. Honda but they have to be newer."  (Exhibit E, T000629, T000634.)  On January 9, 2007, when asked how many vehicles they wanted, the undercover agent stated that "At least a couple would be good, man."  (Exhibit C, Bates T000664.)  Later that day, the same undercover agent specified, "We'll talk to see if we can get a Lexus.  I would

---

[4]  By contrast, the drug sting operation (Counts 35-43) was designed to, and did, benefit the community by moving drugs out of the stream of commerce and into the government's possession.

[5]In a recorded body wire conversation on January 9, 2007, 1218 states that "we have only one *switch* and we are going to use it for all of them."  (Exhibit C, Bates T000664.)  This is believed to be a reference to a dummy Toyota ignition switch furnished and/or used by 1218 in starting the stolen Toyota vehicles.

[6]The attached transcripts are sample drafts.  They are submitted as examples only, not as definitive transcriptions or translations of the recorded conversations.

1   like to get a Lexus

2   . . . . so then we can count on one of those. [U/I] . . . You can find one right?" (Exhibit F, Bates

3   T000682-683.)

4         These are examples that do not exhaust all the ways 1218 and the agents encouraged and

5   actively aided, not merely condoned, the theft of 16 vehicles from innocent members of the

6   public. Thus here, in contrast to every cited case, the government, by intention and design,

7   created a real, not a fake criminal enterprise that never would have existed but for the

8   government's outrageous actions. This is, therefore, that rare and extreme case, beyond the

9   bounds of due process, where the government has engineered and directed real crimes against

10  the public from start to finish, and dismissal of the charges against defendants Gonzalez and

11  Nochez is fully warranted.

12                                           **II.**

13                                      **CONCLUSION**

14        For all the foregoing reasons, the Court is respectfully urged to dismiss Counts 50, 51,

15  52, 56, 57, 58, 59 and 60 of the Third Superceding Indictment.

16

17  Dated: December 22, 2009                    Respectfully submitted,

18                                              WEINBERG & WILDER

19

20                                              /s/ Nina Wilder
                                                _____
21                                              NINA WILDER
                                                Attorneys for Defendant
22                                              DANIEL GONZALEZ

23

24

25

26

27

28