JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CABN 163973)
Chief, Criminal Division

W.S. WILSON LEUNG (CABN 190939)
CHRISTINE Y. WONG (NYBN 3988607)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-6758/7301
    Facsimile: (415) 436-6753
    E-Mail: wilson.leung@usdoj.gov

THERYN GIBBONS (NYBN 759321)
Trial Attorney

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No: CR-08-0730 WHA |
| | ) | |
| v. | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANTS' MOTION TO DISMISS |
| | ) | INDICTMENT FOR OUTRAGEOUS |
| RODIL NOCHEZ, et al., | ) | GOVERNMENT CONDUCT |
| | ) | |
| | ) | Hearing: January 19, 2010 |
| Defendants. | ) | Time: 2:00 p.m. |
| | ) | Court: Honorable William H. Alsup |
| _____ | ) | |

    Defendants Rodil Nochez and Daniel Gonzalez filed a motion to dismiss the Counts 50-52 and 56-60 of the Third Superseding Indictment. For the reasons set forth below, defendants' motion has no basis in law and fact and should be denied.

//

GOVERNMENT'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

**I.     Background**

In or about October 2006, agents at Immigration and Customs Enforcement ("ICE") received information from a confidential informant ("CI") that members of the transnational gang MS-13 were involved in stealing cars. *See* Declaration of Christopher J. Merendino, at ¶ 2. Based on this information, the agents instructed the CI to approach the gang members and other individuals known to the CI to be involved in car thefts, and state that he knew an individual who wanted to purchase stolen cars in order to export them out of the country. *Id.* at ¶ 2. In conjunction with California Highway Patrol officers, ICE agents conducted an undercover operation whereby the CI introduced two undercover officers posing as exporters of stolen cars to the individuals whom the CI knew previously to be involved with stealing vehicles. *Id.* at ¶ 3. ICE and CHP set up a warehouse location where the car thieves would deliver the stolen vehicles. *Id.* The undercover agents then paid the defendants for the cars that were delivered. Law enforcement officers did not provide any tools to steal the cars, and the CI was specifically instructed to not participate in the actual car thefts.[1] *Id.* All the CI was instructed to do– and did– was to introduce the car thieves to alleged purchasers of the cars, the undercover officers.

As part of this operation, the CI approached Nochez and Gonzalez who agreed to provide stolen cars for export. Indeed, in a recorded conversation on January 9, 2007, Nochez asked the undercover officer twice in succession, "How many more of these [stolen cars] do you want?" *See* Declaration of Christine Y. Wong, Ex. A, at 3. The undercover officer replied, "I don't know . . . At least a couple would be good, man." Nochez further asked, "More or less uh . . . for example, about how many cars can you move a week, more or less?" *Id.* at 6. The undercover officer didn't give a specific answer, responding instead, "It depends, like right now, I was going to tell you that this week, the dude that moves the containers well, we haven't been able to get a hold of him." *Id.* Shortly thereafter, in the same conversation, Nochez stated, "But we can bring

---

[1] On one occasion, after the defendants stole a car, the CI rode in the stolen vehicle to the warehouse where the car was to be delivered. The CI, however, did not participate in stealing the car.

four a week, even more. You know." *Id.* at 7. Gonzalez affirmed the same, "Four a night." *Id.* Nochez repeated again, "In one night we can bring four, man." *Id.* at 8. In another conversation later that day, Gonzalez said to the undercover agent, "I wanted to say something, nah . . . I'm not sure how . . . We liked it more . . . be like at least (U/I) . . . for partnership, you know? I think that it's best to (U/I) . . . that way." *See* Wong Decl., Ex. B at 5. In short, Gonzalez proposed to the undercover agent that he and Nochez enter into a partnership to continue to provide stolen vehicles.

Ultimately, Nochez and Gonzalez sold the following vehicles to the undercover officers:
- on November 17, 2006, a 2003 Toyota Matrix (Count 50);
- on November 22, 2006, a 2001 Toyota 4Runner (Count 51);
- on November 28, 2006, a 2000 Toyota 4Runner (Count 52);
- on January 9, 2007, a 2002 Toyota 4Runner (Count 56);
- on January 9, 2007, a 2002 Toyota Tacoma (Count 57);
- on January 17, 2007, a 2003 Toyota Tacoma (Count 58);
- on January 17, 2007, another 2003 Toyota Tacoma (Count 59); and
- on January 17, 2007, another 2003 Toyota Tacoma (Count 60).

In each of the counts, the indictment charges the defendants with attempt to export a stolen car, in violation of Title 18, United States Code, Sections 553(a) and 2.

**II.   Argument**

In order to dismiss an indictment based on claims of outrageous Government conduct, the "Government's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Smith*, 924 F.2d 889 (9th Cir. 1991) (citations omitted); *see also United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008). There are two ways to satisfy this standard: (1) the Government's involvement must be *malum in se* or (2) "amount to the engineering and direction of the criminal enterprise from start to finish." *Id.* As the Ninth Circuit has explained, "a defendant must meet an extremely high standard." *Id.* In *United States v. Bonanno*, 852 F.2d 434, 437-38 (9th Cir. 1988), the Ninth Circuit set forth five factors that, when satisfied, indicate that the governmental conduct was acceptable. The five factors are:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and strategem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

Applying these factors, courts have sanctioned a wide range of Government activity, including the following:

- the use of false identities by undercover agents, *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir. 1984);

- the supply of contraband at issue in the offense, *Hampton v. United States*, 425 U.S. 484, 489 (1976); and

- the commission of equally serious offenses by an undercover agent as a part of the investigation, *United States v. Stenberg*, 803 F.2d 422, 430 (9th Cir. 1986).

In one of the few cases where the court reversed a conviction due to outrageous government conduct, *Greene v. United States*, 454 F.2d 783 (9th Cir. 1972), the Government was truly involved in the illegal activity from start to finish–the agent re-established contact with the defendants after their arrest on former bootlegging charges, offered to supply equipment and operator for a still, supplied sugar at wholesale prices, urged defendants to resume production even though they had expressed difficulties in completing production, and acted as the only customer for the illegal liquor.

      Defendants here claim that the Government engineered and directed the criminal enterprise from the start. Defendants' claim has no basis in law and fact, as is made clear by applying the five *Bonanno* factors. First, as set forth above, the defendants were already involved in stealing cars when they were approached by the CI. Nochez and Gonzalez corroborate the CI's understanding of their involvement in stealing cars when they told the undercover agent they could steal as many as four cars a night. *See* Wong Decl., Ex. A at 7. Second, the agent's participation was not necessary to enable the defendants to continue the criminal activity. Indeed, neither the CI or the undercover agents provided any tools to Nochez

and Gonzalez to steal cars, nor was the CI directly involved in stealing any of the cars. Defendants' bald assertion in the motion to dismiss regarding the CI's involvement in stealing cars is wholly unsupported by affidavits of fact.[2] Indeed, Nochez and Gonzalez committed the car thefts without the aid of either the undercover agents or the CI. All the Government provided was a buyer for cars that Nochez and Gonzalez were already involved in stealing. The undercover agents in this case served no different a role than undercover agents in a drug transaction, who offer to and do purchase drugs allegedly for distribution. Here, the undercover agents simply posed as buyers for cars that were allegedly going to be distributed overseas. The defendants were well aware of the "plan" for the cars and willingly participated. Third, the use of undercover agents and establishing the warehouse storefront served as an artifice and stratagem to ferret out criminal activity. Fourth, the undercover agents, after being introduced by the CI, infiltrated a criminal organization. Finally, the CI had approached Nochez and Gonzalez, individuals who were already deeply involved in stealing cars. The Government's conduct in this case does not come close to satisfying the "extremely high standard" required to show outrageous Government conduct.

//
//
//
//
//
//
//

---

[2] Defendants rely solely upon one comment, attributed to the CI in one of the draft transcripts. Defendants claim that the CI referred to a "switch," which they interpret to mean a tool that would aid in the car thefts. Defendants make this claim without submitting an affidavit from a witness to the conversation who can confirm their interpretation. As Special Agent Merendino attests in his affidavit, the CI was specifically instructed not to participate in the car thefts, and he was not aware of any tools that the CI or the undercover agents gave to the defendants to aid in the car thefts. For this reason, among others, the Government's operation here is clearly distinguishable from the problematic scenario in *Greene*, 454 F.2d 783.

For the reasons set forth above, the Government respectfully requests that the Court deny defendants' motion to dismiss.

DATED: January 12, 2010

                                              Respectfully submitted,

                                              JOSEPH P. RUSSONIELLO
                                              United States Attorney

                                  By:    /s/
                                              THERYN GIBBONS
                                              W.S. WILSON LEUNG
                                              CHRISTINE Y. WONG
                                              Assistant United States Attorneys