**SETH P. CHAZIN (CSBN 133777)**
**LAW OFFICES OF SETH P. CHAZIN**
Attorney at Law
1164 Solano Avenue
Albany, CA 94706
Telephone: (510) 507 - 8100
Facsimile: (510) 525 – 0087

Attorney for Defendant
**RODIL NOCHEZ**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RODIL NOCHEZ, <br><br> Defendant. | Case No.: CR-08-0730-WHA <br><br> **MOTION IN LIMINE TO EXCLUDE GOVERNMENT TRANSCRIPTS AND CO-CONSPIRATOR STATEMENTS** |

## INTRODUCTION

On February 4th, 2010 at 10:33 p.m., just four days before the Final Pre-trial Conference and 11 days before the jury trial is set to commence, the government sent the defense a letter disclosing for the first time the exhibits and witnesses it intends to produce at trial.  According to this Court's Final Scheduling Order (Docket #998), this disclosure was due 28 days prior to trial. Therefore, this disclosure was made essentially **17 days** late.  The letter also identified additional recordings that the government intends to present to the jury.  This disclosure was due 56 days prior to trial and thus was essentially **45 days** late.

As previously argued, the defense believes the Court should adhere to its scheduling order and limit the government to presenting only witnesses, exhibits and recordings that were disclosed in a timely manner.  This would be appropriate as a 45 day delay is particularly egregious and prejudicial to the defense.  However, should the Court allow the government to again defy its orders unpunished, Mr. Nochez makes the following arguments as to the disclosures made in the government's February 4, 2010 letter.

# I.
**THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM INTRODUCING ITS RECORDINGS AND TRANSCRIPTIONS OF RECORDINGS BECAUSE THE GOVERNMENT IS UNABLE TO PROVIDE A SUFFICIENT FOUNDATION TO SUPPORT THEIR ADMISSION.**

The government has provided the defense with numerous recordings and transcriptions of recordings made in this case.  Several of these recordings allegedly involve Mr. Nochez, co-defendant Daniel Gonzalez, Confidential Informant 1218, and several undercover agents.  These recordings were often made by body wires, and are typically of very poor quality.  The poor quality of these recordings and the presence of up to five speakers at once obviously make it very difficult to positively identify who is saying what.  Nonetheless, the government claims to have somehow managed to identify the speaker of each and every statement audible on the recordings.

Federal Rule of Evidence 901 states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Under *Fed R. Evid. 901(b)(5)*, "voice identification to determine the admissibility of recorded conversations may be made by one who has heard the voice 'at any time under circumstances connecting it with the alleged speaker.'" *United States v. Thomas*, 586 F.2d 123, 133 (9th Cir. 1978).  "Lay opinion on this issue is permissible so long as the witness testifying has this requisite familiarity with the

speaker." *Id*. However, the Court is obligated to undertake certain steps to ensure the accuracy of the transcripts and the attribution of speakers:

> Generally, the [appellate] Court reviews the following steps taken to ensure the accuracy of the transcripts: (1) whether the court reviewed the transcripts for accuracy, (2) whether defense counsel was allowed to highlight alleged inaccuracies and to introduce alternative versions, (3) whether the jury was instructed that the tape, rather than the transcript, was evidence, and (4) whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations.

*United States v. Rrapi*, 175 F.3d 742, 746 (9th Cir. 1999) (*cert. denied*) (holding that exclusion of transcripts for inaccuracy by the district court was appropriate). The third factor does not apply to foreign language tapes. *See United States v. Fuentes-Montijo*, 68 F.3d 352, 355 (9th Cir. 1995).

As stated above, the government revealed a number of transcripts it intends to produce just last week, 45 days past the disclosure deadline. The defense has not had an opportunity to prepare transcripts for all those recordings but is making every effort to do so in an attempt to test the accuracy of the government's transcripts which they seek to introduce into evidence

Remarkably, the government has identified a speaker for each and every statement in its transcripts. With such a low quality recording and up to five overlapping voices, this kind of precision is questionable. Of the recordings that the defense has been able to review, many of the voices are so low and so difficult to distinguish that the purported ability of the government to identify and distinguish one person's voice from another is doubtful. This concern is amplified by John Moore's testimony before the Court on January 13, 2010. The government had been asked by the Court to present a witness who could identify voices on several recordings; the government offered John Moore. *Transcript of January 13, 2010 Hearing* at

168-9. At that hearing, Mr. Moore, the government's purported expert on voice identification, stated that he could not make any such identifications. *Id*.

The government's presentation of Mr. Moore as its witness demonstrates that there is no foundation to support the voice identifications made in the government's transcripts. Mr. Moore's inability to identify the voices stands in stark contrast to the government's claim that it has definitively identified a speaker for each and every statement. Accordingly, the Court has significant reason to doubt the accuracy of the government's transcript.

As stated in *Rrapi*, the Court has a duty to review the transcripts for accuracy. One alternative is for the Court to purge the transcripts of any and all identifications (i.e., allow the statements to remain but remove the alleged speakers' names), while allowing the defense to later object to the accuracy of the statements.

## II.
### THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING STATEMENTS MADE BY CO-DEFENDANT GONZALEZ THAT HE INTENDED TO GIVE NOCHEZ PART OF THE PROCEEDS OF THE ALLEGED SALE OF STOLEN VEHICLES.

In its February 4, 2010 letter, the government indicated that it would attempt to introduce two statements against Mr. Nochez as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E). These two statements were made by co-defendant Daniel Gonzalez. Both statements are summarized by the government as follows: "in negotiating the price of a stolen car with an undercover agent, Daniel Gonzalez stated that he had to pay Rodil Nochez a portion of the money."

The Court should preclude the introduction of these statements for two reasons. First, the wire recordings of the two alleged vehicle buys do not contain any such statement. Additionally, the ICE report relating to one of the alleged vehicle buys does not indicate that such a statement was made. Second, the statements should be excluded because Mr. Nochez will be denied the

opportunity to confront Gonzalez at trial, denying him his Sixth Amendment right to confront a witness against him.

### A. THE STATEMENTS SHOULD BE EXCLUDED BECAUSE THEY DO NOT APPEAR ON THE WIRE RECORDINGS OR IN ONE OF THE ICE REPORTS.

The government intends to offer testimony that, on both November 17, 2006 and November 28, 2006, Gonzalez, while negotiating the price of an allegedly stolen car, stated that he would have to share the proceeds of the sale with Mr. Nochez. Yet no such statement can be found on either the wire recordings of those incidents, and is not mentioned in one of the ICE reports.

The statements also contradict the entire body of discovery produced by the government. No ICE report states that either the ICE or CHP undercovers observed Nochez receive any money. On the contrary, the reports repeatedly state that Gonzalez was the sole negotiator and recipient of the funds.

Lastly, the statements are far more prejudicial then probative. The government seems to be suggesting that Mr. Gonzalez was attempting to bargain for a higher price when allegedly stating he had to divide the proceeds. But the government cannot prove that the statement was not merely an attempt to drive up the price, and that Gonzalez actually had no intention of splitting the money. Again, only one of the ICE reports refers to that statement, and the corresponding transcript lacks any such statement. The implication that Mr. Nochez actually received compensation for the allegedly stolen vehicles is speculation and highly prejudicial, whereas the probative value is minimal. Accordingly, admitting these statements would violate Fed. R. Evid. 403, which forbids the admission of evidence if the probability of prejudice is substantially outweighed by its probative value. In light of the suspect nature of these statements, which are far more prejudicial than probative, and the availability of other superior evidence (i.e., the recordings), the Court should preclude the government from offering these co-conspirator statements at trial.

### B.  ADMITTING THESE STATEMENTS WOULD VIOLATE MR. NOCHEZ'S SIXTH AMENDMENT RIGHT TO CONFRONT A WITNESS AGAINST HIM.

As argued by the defense in its First Set of Motions in Limine (Docket # 1189), admitting co-conspirator statements made by Mr. Gonzalez would violate Mr. Nochez' Sixth Amendment Right to confront a witness against him.  While Mr. Gonzalez has plead guilty already, he has yet to be sentenced and therefore has a vested interest in remaining silent at Mr. Nochez's trial.  In fact counsel for Mr. Nochez has inquired with counsel for Mr. Gonzalez and Mr. Gonzalez's counsel has indicated that Mr. Gonzalez would refuse to testify out of concern for his Fifth Amendment rights.  Mr. Nochez would therefore be denied the opportunity to question Mr. Gonzalez about the statements the government now wishes to introduce.  Absent such an opportunity, Mr. Nochez's Sixth Amendment Rights will be violated.  *See United States v. Bruton*, 391 U.S. 123, 137 (holding that the admission of a co-defendant's statement incriminating a defendant where the co-defendant is not available for cross-examination constitutes reversible error).

The prosecution has argued that these types of statements do not run afoul of the ruling in *United States v. Nguyen*, holding that "[o]nly hearsay statements that are testimonial implicate the Confrontation Clause." 565 F.3d 668, 674 (9th Cir. 2009) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).  However, the government failed to state that the Court in *Crawford* declined to define "testimonial statements." *Nguyen* at 674.  In fact, the Court in *Crawford* considered statements made into response to police interrogations to be "testimonial," despite the fact that they do not fall within the common definition of "testimonial." *Crawford* at 53.  Furthermore, the Court conceded that "the Sixth Amendment is not solely concerned with testimonial hearsay." *Id*.

6

Despite the prosecution's exaggeration of the holding in *Nguyen* and *Crawford*, the fact remains that Mr. Nochez's Sixth Amendment rights must be upheld. The Ninth Circuit has held that "a defendant's Confrontation Clause rights were violated when he was 'prohibited from engaging in otherwise appropriate cross-examination designed . . .`to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.`'" *Vasquez v. Kirkland*, 572 F.3d 1029, 1036 (9th. Cir. 2009) (citations omitted). The government is attempting to introduce these statements for the sole purpose of incriminating Mr. Nochez. Mr. Nochez is entitled to, and had Mr. Gonzalez not been charged, would cross-examine him regarding these alleged statements. The ability to cross-examine Gonzalez on these statements is particularly important in light of the fact that there are no recordings of Gonzalez which appear to corroborate the allegation that he in fact made these statements.

Accordingly, the Court should preclude the government from introducing the above-referenced co-conspirator statements.

### III.
### THE COURT SHOULD DENY THE GOVERNMENT'S MOTION TO PRECLUDE THE DEFENSE FROM INTRODUCING EXTRINSIC EVIDENCE TO IMPEACH CONFIDENTIAL INFORMANT 1218.

The prosecution has requested that the Court prohibit the defense from introducing extrinsic evidence to impeach the testimony of CI-1218. The request is without merit, inconsistent with existing case law, and premature. Consequently, the Court should deny the request and refrain from limiting Mr. Nochez's ability to impeach CI-1218.

Prosecutors' use of informers is a "dirty business." *U.S. v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir 1993). "The use of informants . . . is fraught with peril." *United States v.*

*Montgomery*, 998 F.2d 1468, 1472 (9th Cir. 1993) (*citing Bernal-Obeso*, 989 F.2d at 333). As Ninth Circuit Judge Stephen Trott (and former associate attorney general) has observed, these informants are "likely to say and do almost anything to get ... out of trouble ... inclu[ding] ... lying, committing perjury, manufacturing evidence, soliciting others to corroborate their lies with more lies .... Many are outright conscienceless sociopaths to whom 'truth' is a wholly meaningless concept." Assoc. Attorney General Stephen Trott, *Successful Use of Informants as Witnesses for the Prosecution in a Criminal Case* (concluding that informants are inherently incredible, dishonest, and widely despised and mistrusted), *printed in* United States Department of Justice, *Prosecution of Public Corruption Cases*, at 117-18 (February 1988).

Unfortunately, our "judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison." *Bernal-Obeso*, 989 F.2d at 334. "By definition, informers are cut from untrustworthy cloth," and must be carefully watched to "prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom." *Id*.

Consequently, the Supreme Court and the Ninth Circuit has favored allowing defendants to vigorously cross-examine and impeach confidential informants. *See e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (holding that the court cannot prohibit all inquiry of a government witness's bias); *United States v. Wilmore*, 381 F.3d 868, 872 (9th Cir. 2004) ("it is well-established that while a district court has discretion to limit cross-examination, it may not impose restrictions that 'limit[] relevant testimony and prejudice[] the defendant.'"); *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995). Failing to allow a thorough inquiry into the

credibility of a confidential informant therefore violates the defendant's Sixth Amendment right to confront witnesses against him. *Wilmore* at 872-3.

Here, CI-1218 is a particularly heinous individual. He has committed or is suspected of having committed a litany of felonies, charged and uncharged, including auto theft, rape, and murder. Under ordinary circumstances, he would have been prosecuted for his crimes and imprisoned and/or deported from the United States some time ago, preventing him from wreaking havoc on the citizens of the United States and residents of the Bay Area. The defense suspects the only reason he remains in the United States, and thus available for this litigation, is because the government has maintained him as an informer, unleashing him on the public to continue his criminal and sociopathic behavior. In fact, while in the employ of the government as an informant, he was arrested and convicted of auto theft, a felony, in San Mateo County. Clearly, he is a desperate individual, willing to do and say anything to avoid the consequences of his many crimes.

Nonetheless, the government insists that the defense should be precluded from introducing extrinsic evidence to impeach him. The government cites Fed. R. Evid. 608(b), which states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." However, an exception to this rule exists, allowing the introduction of extrinsic evidence to contradict the testimony of a witness. *See United States v. Castillo*, 181 F.3d 1129, 1133 (9th Cir. 1999). Still, the government opposes the introduction of extrinsic evidence under this exception. To support its argument, it has greatly exaggerated the holdings in the case law it cites. For example, the government cites *Castillo*, arguing that it strictly prohibits the defense from introducing extrinsic evidence to impeach a witness. *Government's Memorandum of Law*

*Regarding the Limited Admissibility of Extrinsic Evidence for Impeachment*, at p. 4 (filed February 8th, 2010).  However, the court in *Castillo* goes on to rule that "we do not hold that a bright line distinction between testimony volunteered on direct examination and testimony elicited during cross-examination must be rigidly enforced so as to exclude all impeachment by contradiction of testimony given during cross-examination." 181 F.3d at 1134.  Thus the limited prohibition on the introduction of extrinsic evidence to impeach is intended to be employed only when "opposing counsel may manipulate questions to trap an unwary witness into 'volunteering' statements on cross-examination."  *Id*. at 1133.  The defense has no intention to attempt to trap CI-1218, but only to directly and clearly inquire as to past criminal acts and other relevant matters which will weigh upon his credibility.   In light of CI-1218's rich and prolific criminal record, Mr. Nochez expects that he will deny many of his past wrongs and crimes, and if he in fact does, the defense is entitled to impeach with extrinsic evidence.

       The government also cites *United States v. Kincaid-Chauncey* to support its argument that the defense may not offer extrinsic evidence to contradict testimony offered on cross-examination.  But *Kincaid-Chaucey* merely echoes the ruling in *Castillo*.  *United States v. Kincaid-Chauncey*, 556 F.3d 923, 932-3 (9th Cir. 2009).  Citing *Castillo*, it again states that: 1) there is no bright line rule excluding extrinsic evidence to contradict testimony elicited on cross-examination, and 2) that the "rule" is designed to prevent attorneys from trapping unsuspecting witnesses.  *Id*. at 933.  Therefore *Kincaid-Chaucey* does not expand upon or alter the ruling in *Castillo* in this respect.

       Accordingly, the defense should be free to offer extrinsic evidence to contradict testimony elicited on cross-examination as established by Ninth Circuit precedent.

**CONCLUSION**

For the foregoing reasons, Mr. Nochez respectfully requests that the Court grant the orders requested herein.

Respectfully submitted,

**DATED:  February 10, 2010**              /s/
                                                                    **SETH P. CHAZIN**
                                                                    **Attorney for RODIL NOCHEZ**